[No. B015241. Second Dist., Div. One. Dec. 18, 1986.]

BROWNIE MILLER et al., Plaintiffs and Appellants, v.
NATIONAL BROADCASTING COMPANY et al.,
Defendants and Respondents.

COUNSEL

Rich & Ezer, Mitchell J. Ezer and David L. Margulies for Plaintiffs and Appellants.

Lillick, McHose & Charles, Kenneth E. Kulzick, Amy D. Hogue, Patricia Duncan, Hufstedler, Miller, Carlson & Beardsley and Otto M. Kaus for Defendants and Respondents.

OPINION

HANSON (Thaxton), J.—

### INTRODUCTION

The events giving rise to this action occurred on the night of October 30, 1979, when an NBC television camera crew entered the apartment of Dave and Brownie Miller in Los Angeles, without their consent, to film the activities of Los Angeles Fire Department paramedics called to the Miller home to administer life-saving techniques to Dave Miller, who had suffered a heart attack in his bedroom. The NBC television camera crew not only filmed the paramedics' attempts to assist Miller, but NBC used the film on its nightly news without obtaining anyone's consent. In addition, after it had received complaints from both Brownie Miller and her daughter, Marlene Miller Belloni, NBC later used portions of the film in a commercial advertising an NBC "mini-documentary" about the paramedics' work.

The paramedics were unable to successfully resuscitate Dave Miller; he died that October evening at Mount Sinai Hospital. His widow, Brownie,

and daughter, Marlene (hereinafter, sometimes plaintiffs or plaintiff wife and plaintiff daughter), brought suit against defendants National Broadcasting Company (NBC), doing business as KNBC, a Los Angeles television station, Ruben Norte (Norte), a producer employed by NBC, and the City of Los Angeles (City) for damages, alleging trespass, invasion of privacy, and infliction of emotional distress against all defendants. After considerable discovery and amendment of pleadings, the trial court granted defendants' motion for summary judgment. Plaintiffs appeal. We affirm in part and reverse in part.

## PROCEDURAL HISTORY

*On May 29, 1980,* plaintiffs filed a "Complaint for Damages: Trespass; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress; Invasion of Privacy"[1] naming NBC, Norte, City's Fire Department as defendants. Plaintiffs prayed for general and special damages according to proof and punitive damages in the sum of $500,000.

*On July 6, 1984,* defendants NBC and Norte filed a notice of motion for summary judgment as to plaintiffs' second, third, fourth, fifth, sixth and seventh causes of action along with points and authorities.

*On August 6, 1984,* the superior court, after consideration of the moving and opposition papers, deemed defendants' motion to be a judgment on the pleadings and granted plaintiffs 15 days to amend with the following proviso: "Plaintiff[s] may plead one tort for each broadcast seen by each plaintiff and may plead trespass so long as damages are not based on the broadcast."

*On August 21, 1984,* plaintiffs filed a "First Amended Complaint for Damages" which essentially incorporates the allegations of the seven causes

---

[1]The complaint contained seven causes of action. The *first cause of action* by plaintiff wife against all defendants was based on trespass; the *second cause of action* by plaintiff wife against NBC and Norte was for intentional infliction of emotional distress; the *third cause of action* of plaintiff daughter against NBC and Norte was for intentional infliction of emotional distress; the *fourth cause of action* of plaintiff wife against all defendants was for negligent infliction of emotional distress; the *fifth cause of action* by plaintiff daughter against all defendants was for negligent infliction of emotional distress; the *sixth cause of action* of plaintiff wife against all defendants based on an invasion of privacy; and the *seventh cause of action* of plaintiff wife was against all defendants and based on invasion of privacy.

of action in the original complaint (see fn. 1, *ante*) into three causes of action.[2]

*On August 31, 1984,* defendants NBC and Norte filed a notice of motion and motion for Judgment on the Pleadings, arguing that the amended complaint did not comply with the court's order of August 6, 1984 by improperly pleading several different tort actions arising out of each television broadcast

[2]The first amended complaint set forth three causes of action:

The *first cause of action* for personal injury and damages *by wife* against all defendants is based on the theory of *trespass.* It alleges that on October 30, 1979, she was the lessee in possession of her domicile in Los Angeles when defendant City through its agents and employer "invited, permitted and assisted employers of defendants [NBC and Norte], and said defendants did, intentionally, wrongfully and unlawfully enter on said property" without her knowledge and consent to film or videotape the efforts of the paramedics to revive her decedent husband who had suffered a heart attack; that defendants had "full knowledge and intent that the film or videotape would be broadcast on television station KNBC, without the consent and knowledge of plaintiff Miller;" and that "as a proximate result of the trespass of defendants, and each of them, she sustained personal injuries, including apprehension, nervousness and mental anguish, all to plaintiff's general and special damage in an amount to be proven;" and that "defendants, and each of them, were guilty of malice, fraud and oppression in that they deliberately committed said act of trespass for the purpose of injuring plaintiff Miller."

The *second cause of action* for damages for personal injury *by plaintiff wife* against defendants NBC and Norte alleges that on or about November 19, 1979, defendants knew the identity of the address of plaintiff and her relationship [widow] to Dave Miller, who died on October 30, 1979; that without her knowledge and consent telecast film or videotape footage of her husband being attended to by defendant City's paramedic unit; that after learning of the telecast of said footage, Miller spoke with defendant Norte and was advised and assured that none of the footage would be telecast again; that in spite of the assurances, the footage was shown on multiple occasions and was seen by her on at least one occasion during the week of November 26, 1979; that in addition to seeing the subject footage, she received many telephone calls from friends and relatives about having viewed the film or videotape footage; that defendants' conduct was negligent, unlawful, wrongful, intentional, malicious and done with wanton and reckless disregard of the consequences to plaintiff; that defendants entered the property of plaintiff Miller, intentionally excluded her from a portion of said property, permitted, assisted in and photographed the efforts to revive plaintiff Miller's decedent husband; and permitted, assisted in and telecast said photographs with intent and design to injure Miller, disregarding the comfort of said plaintiff's life and the peace and tranquility of her mind, and to invade and impair the seclusion of said plaintiff's private life; that as a direct and proximate result of the photographing and telecasting of said photographs, plaintiff's *right to privacy* has been violated in that said plaintiff's physical solitude and home have been wrongfully invaded by her viewing said telecasts, and by receiving numerous unwanted telephone calls about said telecast, all of which have resulted in the disruption of said plaintiff's life and the peace and tranquility of her mind, and has caused and will continue to cause injury to her mental health, strength, activity and body and have caused, and will continue to cause, said plaintiff great mental, physical and nervous pain and suffering; and that as a proximate result of the aforementioned acts, plaintiff suffered mental anguish, and *emotional and physical distress,* and has been injured in mind and body.

The *third cause of action* for damages for personal injury *by plaintiff daughter* against NBC and Norte is essentially identical to that of the second cause of action by plaintiff Miller.

The plaintiffs, as to each cause of action, prayed for special and general damages according to proof, as well as punitive damages in the sum of $500,000.

allegedly viewed by plaintiffs and was in contravention of the Uniform Publications Act section 3425.3.

*On September 6, 1984,* a mandatory settlement conference was conducted and the matter set for trial on December 4, 1984.

*On September 20, 1984,* the superior court denied defendants NBC and Norte's motion to strike the at-issue memorandum and the judgment on the pleadings.

(The record reflects that at this hearing defense counsel requested the trial be continued to allow time to prepare and file a motion for summary judgment and plaintiffs' counsel waived all time and notice requirements for the motion.)

*On September 19, 1984,* defendant City filed its answer to the first amended complaint, denying the complaint and affirmatively alleging that City's employees were given actual or implied consent to enter plaintiff Miller's residence, and that defendant City is immune from liability pursuant to Government Code sections 815.2 and 820.2 and Civil Code section 47.

*On October 18, 1984,* following extensive discovery including depositions, defendants NBC and Norte filed a "Notice of Motion and Motion for Summary Judgment or, in the alternative, for Summary Adjudication." The moving papers included points and authorities in support of the motion and a "Statement of Undisputed Facts."

(The plaintiffs' "Appendix in Lieu of Clerk's Transcript on Appeal" does not include copies of exhibits attached to defendants' motion for summary judgment, consisting of extracts from depositions taken during discovery. Pursuant to rule 12a, California Rules of Court, we have ordered up and reviewed the entire superior court file (No. C-324427), including copies of the portions of depositions referred to by defendants in their moving papers and plaintiffs' opposition papers.)

*On November 6, 1984,* plaintiffs filed a "Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment or Summary Adjudication; Statement of Disputed and Undisputed Facts."

(Plaintiffs' opposition papers direct the court's attention to other portions of the depositions referred to by defendants in their moving papers and incorporate deposition testimony of Fire Captain Anthony R. De Domenico of the Los Angeles City Fire Department and Douglas E. Brown, Senior Paramedic for the Bureau of Emergency Medical Service, Los Angeles City

Fire Department, along with a copy of "Defendants' Response to Plaintiffs' Third Set of Interrogatories.")

*On November 13, 1984,* defendants filed "Reply Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment," asserting that plaintiffs concede 1) "that they have no cause of action based upon the *contents* of the KNBC broadcast; 2) that they cannot as *relatives,* maintain an action based upon the KNBC *broadcast depicting* their relative; 3) and that the consoling telephone calls from friends and neighbors, which they naturally received after Mr. Miller's death, cannot give rise to an independent cause of action." (Italics original.)

Defendants further construe plaintiffs' memorandum in opposition to their motion for summary judgment as asserting that the amended complaint states a claim for an "intrusion," i.e., "invasion of privacy" by reason of the publicity of their deceased relative which caused emotional harm. Defendants also filed "Defendants' Response to Plaintiffs' Assertion of Various Material Facts in their Opposition to Defendants' Motion for Summary Judgment."

*On November 16, 1984,* counsel for all defendants (NBC, Norte and City) and plaintiffs presented oral argument; documentary evidence was introduced and the cause was submitted for decision.

*On April 24, 1985,* the court below, "after full consideration of the moving papers and responding papers, all supporting papers, and oral argument of counsel," signed and filed its "Judgment by Court and Statement of Decision."

In ruling in favor of defendants NBC and Norte and against plaintiffs, the court found plaintiffs' stated causes of action had no merit and presented no triable issues of fact. The court stated:

"1. Plaintiffs Brownie Miller and Marlene Belloni have no actionable claim for invasion of privacy, intentional infliction of emotional distress or negligent infliction of emotional distress based upon their alleged viewing of NBC broadcasts allegedly depicting their (now deceased) relative, Mr. Miller. *Flynn* v. *Higham,* 149 Cal.App.3d 677, 683 [197 Cal.Rptr. 145] (1983); *Coverstone* v. *Davies,* 38 Cal.2d 315 [239 P.2d 876] (1952); *Hendrickson* v. *California Newspapers, Inc.,* 48 Cal.App.3d 59 [121 Cal.Rptr. 429] (1975); *Grimes* v. *Carter,* 241 Cal.App.2d 694, 702 [50 Cal.Rptr. 808, 19 A.L.R.3d 1310] (1966).

"2. Defendants are entitled to summary judgment of Plaintiff Miller's cause of action for the alleged trespass by Ruben Norte and other employees

of Defendant National Broadcasting Company, Inc. because (1) there is no evidence that Defendants entered Plaintiff Miller's property maliciously; and (2) Plaintiff Miller suffered no actual damage as a result of the alleged entry."

*On June 20, 1985,* the superior court denied plaintiffs' motion for a new trial.

*On July 8, 1985,* plaintiffs timely filed their notice of appeal and notice of election to prepare appendix.

*On February 3, 1986,* by stipulation, the appeal against defendant City was dismissed.

## THE SCENARIO

Defendant Norte, an NBC news field producer in charge of new stories and projects, was assigned a minidocumentary on fire department paramedics and their work. The minidocumentary was to run during the five weekdays for two weeks, airing for five minutes at the end of the 6 p.m. news, and about half that time on the 11 p.m. news. The first week concerned the paramedics' work generally. The second week focused on the administering of CPR by a paramedic team.

Norte, holding a University of Texas degree in Mass Communications, with field newspaper and television experience and five years as field producer for KNBC, commenced background work and research well in advance of the scheduled showing of the minidocumentary. Filming started four to five weeks before airing. In preparation of the documentary, Norte contacted not only the fire departments of the City and County of Los Angeles but also the paramedics in many other cities, including Santa Monica, Sierra Madre, Glendale, Burbank and Seattle.

Norte contacted Tony De Domenico, the Los Angeles City Fire Department medical representative, and discussed the feasibility of having a film crew accompany a unit of paramedics, and was advised that it would be acceptable with the City. (Norte in his deposition testified that he did not discuss with De Domenico or anyone else a requirement of getting permission from any of the persons whose home the film crew would enter.) Norte testified that "My intent was to film and document whatever their work was and whatever it happened to be when we filmed." He told the paramedics' media representative, Brown, that he wanted to film something "dramatic." He personally accompanied his film crew, consisting of a cameraman and a soundman, and between 10 and 15 times entered private residences with

the film crew while filming with the paramedics. He testified that about half of the time someone asked what they were doing, that he always responded, and that no one objected. Norte also testified that it was standard practice in the television industry to secure consent before entering someone's home to film, but that he had not considered the necessity for such permission when accompanying the paramedics on their rounds.[3]

Turning specifically to the instant case, Norte testified that his crew was with the paramedic unit which was responding to a call that Mr. Miller had suffered an apparent coronary. Before proceeding to the Miller home, the paramedic unit had responded to at least four other calls, including an overdose case and an automobile accident. Norte rode in back of the paramedics' ambulance with Stan Riley (carrying a film-tape recorder) and John Parson (carrying a camera). When they arrived at the Miller home, all three NBC personnel immediately followed the two paramedics into the apartment and the bedroom, where they filmed the paramedics performing CPR on Dave Miller. At no time did Norte or any other NBC employee seek or obtain consent to follow the paramedic team into the residence. The cameraman and soundman left with the paramedics, who placed the heart attack victim on a gurney and took him to Mount Sinai Hospital, where he subsequently died.

Although Norte later learned that the coronary victim had died, he did not attempt to ascertain the exact location of the filming or the identity of the deceased's relatives. He did not believe that was necessary, because "there was no identity made of the victim verbally or visually [on film]." Norte, while supervising the editing of the film, did observe a tattoo on the victim's arm, but it showed for a "couple of frames, couple of seconds" and he stated that he "would be surprised if anybody could identify him from the film that was aired."

While Norte conceded it was normal procedure to get permission to enter a house, because of the emergency situation "there was no one to ask."[4]

Norte testified that to his knowledge the only time the footage was shown containing this heart attack victim was on the 6 p.m. news on November 19 and a shorter (cut down) version on the 11 p.m. news. He was not aware

---

[3]In his deposition, Norte testified as follows:
"Q. So, it would be normal procedure to just go ahead and film things and then, when someone said, 'Hey, what are you doing,' go ahead and tell them; is that right?
"A. Yes, Yes."

[4]However, in his deposition, defendant Norte testified as follows:
"A. [T]here was a woman in the hallway, which was outside of the bedroom where the heart attack victim was. I do remember seeing a woman there. I didn't speak to her."

that some footage was used as a lead commercial for the following week's series on CPR.

Norte received a telephone call on November 19 after the 6 p.m. news from a woman who said she thought the person in the film was her father, who had passed away recently. Norte told her he was sorry to hear her father passed away. Following the telephone call, he did nothing to ascertain the identity of the victim, but did review the film footage and concluded that it did not show enough of the person that he could be identified.

Plaintiff wife's deposition was taken under oath on September 22, 1983, and she testified substantially as follows: that on October 30, 1979, she and her husband Dave Miller resided in apartment 3, 8211 Blackburn; that at about 10 p.m. on that date, Dave Miller collapsed onto the bedroom floor; and that she screamed and a neighbor came and called the paramedics. Although aware that the paramedics arrived and were administering CPR to her husband, she was completely unaware that the NBC filming unit had arrived and left with them. A police officer who had arrived escorted her to another room while the paramedics were working on her husband. She at no time asked anyone to leave the apartment and no one asked her permission to film the paramedics.

Plaintiff Miller saw the film of her husband and the paramedics weeks after his death; at 10:30 a.m., while she was "flipping" channels looking for a "soap opera" to watch, suddenly the film was shown. She screamed and turned the television off. That was the only time she saw the film.

Plaintiff Miller also received telephone calls from friends who had seen the sequence; the calls upset her. She called Norte only once and said: "What nerve did you have to come into my home and invade my privacy and do the things that you did to disturb my whole household." Norte's answer was, "I am sorry. I am very sorry." She "told him what nerve he had to come in and to do what he did. He was—my husband was a very private person. He would never have liked anything like that to have been on television." Norte's answer was, "I'm sorry. I'm very sorry."

Plaintiff daughter, whose deposition was taken under oath on May 24, 1983, lived in Laguna Beach, quite some distance away from her parents' home. Plaintiff daughter was not present when the paramedics and the NBC film crew went to the Miller home.

Plaintiff daughter was watching the 6 p.m. news on channel 4 on November 19. She "saw [the paramedics] going up a flight of stairs, and 'realized when they went in the doorway—[her] mother had these pictures

on the wall,'" and realized that it was her mother's apartment. She screamed for her husband [Mr. Belloni] to come in the room. She "was [then] out of the room for a couple of minutes until she thought it was over." Before [she] ran out of the room she observed everybody hovering over the heart attack victim and "saw a mask coming down." When she returned to the room, she saw that "they were wheeling him out." She knew it was her father because of a distinctive tattoo on the arm of the man being wheeled out.

Plaintiff daughter telephoned defendant Norte and told him she had viewed the telecast, was very upset, and that he was cruel in not getting permission to do it and not contacting them so a choice could be made to watch it or not. She testified that Norte said that he did not know how to get ahold of them, or "I didn't know. I didn't think of it." She asked Norte not to show it again and he said that it was part of their whole week's special but that he would look into not doing it. She testified that although she did not view the 11 p.m. news, her husband did and it was aired again.

She then called Norte again, "to tell him again how upset [she] was and to ask him not to show it."

After talking to Norte the second time, she stated: "I called all of our immediate relatives that I thought might be watching the late news to make them aware not to watch it or if they did watch it, it was their choice not to be frightened, scared." Only one had seen the documentary.

She also called her mother and told her "not to watch the news because her father was in it; that she had called Norte but didn't know for sure if it was going to be on, but not to take the chance and watch it." To her knowledge, her mother did not view the 11 p.m. newscast.

Plaintiff daughter subsequently saw one showing of a portion of the documentary involving her father for promotional purposes. But four or five close friends, who had been advised to keep track of promotional showings on advice of plaintiff's counsel, had seen several other promotional spots.

As a result of seeing the newscast, she experienced what she called an "anxiety attack" in which she would cry, become emotional, and angry. She was very emotional due to her father's death but after the telecast of the paramedics at work on her father, her emotional state changed to anger. When asked to verbalize why observing the short portion of the segment she saw made it difficult for her to deal with the situation any more than the fact of her father's death alone, she stated that she had been told that when he had the heart attack he died right away, and that the telecast indicated that he was "brought back" several times before he died and she did not

like "to think that he may have experienced some of that [pain], [she] would hate to think that of him."

## STANDARD OF REVIEW

The rules applicable to an appellate review of a summary judgment granted by the trial court are well settled.

Code of Civil Procedure section 437c provides that any party may move for summary judgment in any action or proceeding if it is contended that the action has no merit or that there is no defense thereto: "(b) The motion shall be supported by affidavits, declarations, admissions, answers to interrogatories, depositions and matters of which judicial notice shall or may be taken. The supporting papers shall include a separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed. . . . [¶] . . . The opposition, where appropriate, shall consist of affidavits, declarations, admissions, answers to interrogatories, depositions and matters of which judicial notice shall or may be taken. The opposition papers shall include a separate statement which responds to each of the material facts contended by the moving party to be undisputed, indicating whether the opposing party agrees or disagrees that those facts are undisputed. The statement also shall set forth plainly and concisely any other material facts which the opposing party contends are disputed. . . . (c) The motion *shall* be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Italics added.)

■ Under summary judgment procedure, since defendants NBC and Norte were the moving parties, they had to conclusively negate a necessary element of each of plaintiffs' causes of action or establish a complete defense, and thereby demonstrate that under no hypothesis was there a material factual issue which required the process of a trial. (See *Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 661-662 [150 Cal.Rptr. 384, 12 A.L.R.4th 27].) "The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial." (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851 [94 Cal.Rptr. 785, 484 P.2d 953].) ■ The court is "limited to the facts shown in the affidavits and those admitted and uncontested in the pleadings." (*Levin* v. *State of California* (1983) 146 Cal.App.3d 410, 414 [194 Cal.Rptr. 223].)

However, "[t]he trial court *must* grant a motion for summary judgment if 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law.' (Code Civ. Proc., § 437c.)" (Italics added.) (*McCreery* v. *Eli Lilly & Co.* (1978) 87 Cal.App.3d 77, 82 [150 Cal.Rptr. 730].) This is so, even though justice is generally better served when cases are heard on their merits.

◼ Matters involving First Amendment rights, however, are subject to a somewhat different standard of review than those dealing with other areas of the law. *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 684-685 [150 Cal.Rptr. 258, 586 P.2d 572], cert. den. *Good Government Group of Seal Beach, Inc., et al.* v. *Hogard* (1979) 441 U.S. 961 [60 L.Ed.2d 1066, 99 S.Ct. 2405] (a writ proceeding) stated that "[d]efendants are correct in asserting that, because unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy, and upon such a motion the trial court must determine whether there is a sufficient showing of malice to warrant submission of that issue to the jury. [Citations.]"

In *Sipple* v. *Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1046 [201 Cal.Rptr. 665], the Court of Appeal noted that "it also bears emphasis that a motion for summary judgment in First Amendment cases is an approved procedure because unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights and because speedy resolution of cases involving free speech is desirable [citations]. While the crucial test as to whether to grant a motion for summary judgment remains the same in free speech cases (i.e., whether there is a triable issue of fact presented in the case), the courts impose more stringent burdens on one who opposes the motion and require a showing of high probability that the plaintiff will ultimately prevail in the case. In the absence of such showing the courts are inclined to grant the motion and do not permit the case to proceed beyond the summary judgment stage [citations]."

In the case at bench, the parties themselves facilitated the summary judgment proceedings because the case is one in which the issues are legal questions arising from facts about which there is no basic dispute. As with demurrer procedure on occasion, the issues here are whether plaintiffs have stated causes of action against the defendants. If they have, there are numerous triable issues of fact; if they have not, there are none. ◼ We note also that the designation of the complaint as well as the form in which the complaint is drawn is immaterial in determining what causes of action, if any, are stated by the facts as pleaded. (4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 367, p. 420.)

Mindful of the standard of review in First Amendment matters, we address the questions of law which have been presented on this appeal.

## ISSUES

In addition to identification of causes of action, a principle issue in this litigation is the extent to which the First Amendment to the United States Constitution and article I, section 2 of the California Constitution (hereinafter collectively referred to as First Amendment rights, on occasion) protect newsgathering of this kind from civil liability.

## DISCUSSION

## I.

## TRESPASS: PLAINTIFF WIFE'S FIRST CAUSE OF ACTION

Plaintiff wife has alleged, and it is undisputed, that defendants made an unauthorized entry into her apartment on October 30, 1979. Common law defined such entry as a trespass. ■ "The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another. Such invasions are characterized as intentional torts, regardless of the actor's motivation. Where there is a consensual entry, there is no tort, because lack of consent is an element of the [theory underlying the tort]. 'A peaceable entry on land by consent is not actionable.' (4 Witkin, Summary of Cal. Law (8th ed. 1974) § 351, p. 2612.)" (*Civic Western Corp.* v. *Zila Industries, Inc.* (1977) 66 Cal.App.3d 1, 16-17 [135 Cal.Rptr. 915].)

The trial court awarded summary judgment to defendants on this cause of action "because (1) there is no evidence that Defendants entered Plaintiff Miller's property *maliciously;* and (2) Plaintiff Miller suffered no actual damage as a result of the alleged entry." (Italics added.)

The trial court's ruling concerning the "trespass" was based on the notion that it was "technical" in nature due to the lack of specific malice directed against the Millers by the NBC camera crew. The trial court ignored the fact that the trespass was intentional in the sense that the law understands and uses that word: the defendants intended to cross the threshold of the Miller home. Thus, they committed an intentional tort, which rendered the actors' more refined motivation or intentions immaterial in terms of establishing that commission. As Prosser and Keeton on Torts (5th ed. 1984) section 13, pages 73-74 explained, "[t]he intent required as a basis for liability as a trespasser is simply an intent to be at the place on the land where the trespass allegedly occurred. . . . The defendant is liable for an

intentional entry although he has acted in good faith, under the mistaken belief, however reasonable, that he is committing no wrong."

██ With respect to damages, Prosser and Keeton observe, at pages 76-77, that "[i]t would appear that the defendant trespasser will be liable for all direct consequences of any conduct engaged in while trespassing. Quite frequently, however, the defendant has been held liable for indirect consequences, some of which have not been reasonably foreseeable, of conduct engaged in while trespassing. [Fn. omitted.] It is important to realize that those who use another's land without permission may justifiably have 'risks of losses' allocated to them far beyond those normally imposed when liability is imposed on a negligence theory."

Under California law, the "consequences" flowing from an intentional tort such as a trespass may include emotional distress either accompanied by a physical injury to the person or to the land. (See, e.g., *Acadia, California, Ltd.* v. *Herbert* (1960) 54 Cal.2d 328, 337-338 [5 Cal.Rptr. 686, 353 P.2d 294].) The basic statutory provision concerning tort damages reflects this view, in providing that "[f]or the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333.) In the case at bench, the "consequences" would include plaintiff wife's anguish, i.e., her emotional distress when NBC broadcast her husband's dying moments.

Thus, pursuant to common law principles accepted in California law, plaintiff wife has stated a cause of action for trespass unless First Amendment rights preclude it. (See discussion, *post.*)

II.

INVASION OF PRIVACY—PLAINTIFF WIFE'S SECOND CAUSE OF ACTION

Plaintiff wife has alleged in her complaint a trespass which also constituted the tort of intrusion, one of a group of torts which comprise privacy invasion.

██ The right of privacy has been described as "independent of the common rights of property, contract, reputation and physical integrity, . . . 'the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity. In short it is the right to be let alone.'" (*Gill* v. *Curtis Publishing Co.* (1952) 38 Cal.2d 273, 276 [239 P.2d 630].) Since the "right to be let alone" can be violated in contexts immensely diverse

in consequences and degree, the common law which recognized the right did not easily lend itself to analysis.

An early Harvard Law Review article (1890)[5] deplored the activities of the press in reporting about society functions; some early state statutes tried to prevent entrepreneurs from exploiting an individual to sell their products. (California's statute is Civ. Code, § 3344.)

In 1960, however, Dean W. L. Prosser categorized and defined four basic privacy interests in a classic article entitled *Privacy* which appeared in 48 Cal. L. R. 383, 389.

He described those interests as follows:

"1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.

"2. Public disclosure of embarrassing private facts about the plaintiff.

"3. Publicity which places the plaintiff in a false light in the public eye.

"4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness."

Prosser stated that "[i]t should be obvious at once that these four types of invasion may be subject, in some respects at least, to different rules; and that when what is said as to any one of them is carried over to another, it may not be at all applicable, and confusion may follow." The Prosser analysis has been widely adopted; the Restatement Second of Torts uses it to explain and distinguish the legal principles in this area of the law. Recent California decisions have also employed it. (See, e.g., *Diaz* v. *Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118 [188 Cal.Rptr. 762].)

The case at bench involves the first category of privacy rights, the right to be secure from *intrusion*. Restatement Second of Torts, section 652B declares that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, *if the intrusion would be highly offensive to a reasonable person.*" (Italics added.)

As the Restatement definition indicates, the right to be secure from intrusion is not absolute, but instead is subject to an important limitation.

---

[5]Warren and Brandeis, *The Right to Privacy* (1890) 4 Harv. L. R. 193.

The unintended or mistaken foray into the territory of another does not give rise to liability, nor would damages be awarded for minor incidents of overstepping, which abound in a crowded world.

██ While what is "highly offensive to a reasonable person" suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of "offensiveness" which must be made by the court in discerning the existence of a cause of action for intrusion.

There is little California case law based upon facts showing actual physical intrusion to assist us in making this determination, probably because even today most individuals not acting in some clearly identified official capacity do not go into private homes without the consent of those living there;[6] not only do widely held notions of decency preclude it, but most individuals understand that to do so is either a tort, a crime, or both.[7]

It would seem, however, that degree remains an important factor to be considered in determining "offensiveness"; a "party-crasher" might not, under some circumstances, be regarded as a major tortfeasor, while an intruder upon highly personal, intimate activities or events might very well be. One of the early cases in this country, for example, awarded damages against a person who intruded into a place where a woman was giving birth to a child (*De May* v. *Roberts* (1881) 46 Mich. 160 [9 N.W. 146]). That was considered "highly offensive." There are other areas involving intimate conduct where intrusion would be regarded as actionable at law. A court determining the existence of "offensiveness" would consider the degree of intrusion, the context, conduct and circumstances surrounding the intrusion

---

[6]There are surprisingly few cases in other jurisdictions as well, probably for the same reason. There have been some hospital intrusion cases where the person whose privacy was invaded was ill or dying; see, e.g., *Barber* v. *Time, Inc.* (1942) 348 Mo. 1199 [159 S.W.2d 291]; *Estate of Berthiaume* v. *Pratt, M.D.* (1976) 365 A.2d 792 [86 A.L.R.3d 365]; *Froelich* v. *Werbin* (1976) 219 Kan. 461 [548 P.2d 482]; and see, in a different privacy context, *Bazemore* v. *Savannah Hospital* (1930) 171 Ga. 257 [155 S.E. 194], where hospital authorities summoned the press to take pictures of a deformed infant who had died in the operating room. In California there is *Noble* v. *Sears, Roebuck & Co.* (1973) 33 Cal.App.3d 654 [109 Cal.Rptr. 269, 73 A.L.R.3d 1164] where the investigative efforts on behalf of defendant Sears led to intrusion into a hospital room (not a privacy case at all). Many of the fact patterns involved in the above-cited cases are bizarre, and not accidentally so; all involve intrusions generated by a curiosity or misplaced zeal that most persons eschew.

[7]Besides the more obvious and traditional crimes where trespass is an element of the offense, Penal Code chapter 1.5, "Invasion of Privacy," sets forth the penalties for some of the sophisticated forms of intrusion, from eavesdropping to wiretapping. (§§ 630-635.) Section 630 states, in pertinent part, that "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded.

The matter before us does not involve the death of a statesman nor of a person who was in any way a public figure; that is not in dispute. The case law involving public figures, celebrities and those who invite attention to themselves is not persuasive here, although even as famous a figure as the widow of an American President has been afforded privacy protection from egregious intrusion. (*Galella* v. *Onassis* (1972) 353 F.Supp. 196 (S.D.N.Y.); *Galella* v. *Onassis* (2d Cir. 1973) 487 F.2d 986.) ■ Here, reasonable people could construe the lack of restraint and sensitivity NBC producer Norte and his crew displayed as a cavalier disregard for ordinary citizens' rights of privacy, or, as an indication that they considered such rights of no particular importance.

In our view, reasonable people could regard the NBC camera crew's intrusion into Dave Miller's bedroom at a time of vulnerability and confusion occasioned by his seizure as "highly offensive" conduct, thus meeting the limitation on a privacy cause of action Restatement of Torts, section 652B imposes.

Plaintiff wife has stated a cause of action for breach of privacy, and is entitled to a jury's determination on the cause, unless other rules recognizing public policy limitations or paramount constitutional privileges of the defendants preclude it.

The plaintiff wife's recovery of damages for intrusion involves different rules but the result is the same. In *Dietemann* v. *Time, Inc.* (9th Cir. 1971) 449 F.2d 245, 247, the Ninth Circuit observed that "[d]espite some variations in the description and the labels applied to the tort [of invasion of privacy], there is agreement that publication is not a necessary element of the tort, that the existence of a technical trespass is immaterial, and that proof of special damages is not required."

■ Damages recoverable in California for invasion of a privacy right were discussed in detail in *Fairfield* v. *American Photocopy etc. Co.* (1955) 138 Cal.App.2d 82 [291 P.2d 194]. The Court of Appeal declared that because the interest involved privacy, the damages flowing from its invasion logically would include an award for mental suffering and anguish. *Fairfield* was an appropriation case, but the principles it laid down concerning damage awards in privacy cases relied on a body of California law which had already recognized violation of the right of privacy as a tort.

The court also referred to opinions of other jurisdictions, however. "'The gravamen of the action here charged is the injury to the feelings of the

plaintiff, the mental anguish and distress caused by the publication. In an action of this character, special damages need not be charged or proven, and if the proof discloses a wrongful invasion of the right of privacy, substantial damages for mental anguish alone may be recovered. [Citations.]'" (*Id.*, at p. 89.)

*Fairfield* also approved the rule that "'One whose right of privacy is unlawfully invaded is entitled to recover substantial damages, although the only damages suffered by him resulted from mental anguish.'" (*Id.*, at p. 89.)

The elements of emotional distress damages, i.e., anxiety, embarrassment, humiliation, shame, depression, feelings of powerlessness, anguish, etc., would thus be subjects of legitimate inquiry by a jury in the action before us, taking into account *all* of the consequences and events which flowed from the actionable wrong.

The trial court, in awarding summary judgment to defendants on plaintiff wife's causes of action for privacy invasion and the intentional infliction of emotional distress, mistakenly relied on *Flynn* v. *Higham* (1983) 149 Cal.App.3d 677 [197 Cal.Rptr. 145] (petn. den., S.Ct., Feb. 15, 1984).

In *Flynn*, this court held that the purely personal right of privacy dies with the person. The *Flynn* complaint alleged that the defendants (author and publisher of "Errol Flynn—The Untold Story") defamed plaintiffs (children of the deceased, Errol Flynn) by writing that their father was a homosexual and a Nazi spy.

In affirming the order of dismissal after defendants' demurrer was sustained and the plaintiffs failed to amend their complaint, *Flynn* v. *Higham, supra,* 149 Cal.App.3d 677, 683, quoted the following discussion: "'It is well settled that the right of privacy is purely a personal one; it cannot be asserted by anyone other than the person whose privacy has been invaded, that is, plaintiff must plead and prove that *his* privacy has been invaded. [Citations.] Further, the right does not survive but dies with the person. [¶] It is clear that the publication must contain some direct reference to the plaintiff. The publication must invade the plaintiff's privacy. Where the publication was directed at another individual and referred incidentally to the plaintiff but was not directed at him, no recovery can be had. Where the plaintiff's only relation to the asserted wrong is that he is a relative of the victim of the wrongdoer and was unwillingly brought into the limelight, no recovery can be had.' (Italics in original.) (*Hendrickson* v. *California Newspapers, Inc.* (1975) 48 Cal.App.3d 59, 62 [121 Cal.Rptr. 429].)"

The California cases are legion which support the result reached in *Flynn*.[8] The rationale has been stated well in *Nelson v. Times* (1977) 373 A.2d 1221, at p. 1225: "In the context of this particular tort [invasion of privacy] [many] courts, being wary of spurious claims or those purely emotional in character have refused to recognize such actions. Additionally, if actions for violating the right of privacy were allowed by other than the person directly involved, fixing their boundaries and parameters would become an almost impossible task. For example, within what degree of relationship, if any, must a prospective plaintiff be? Might not a very close friend have as serious an emotional reaction as a mother or father? The consensus seems to be that limiting the action to the person directly involved is a sounder judicial policy. [Citations.]"

In the instant case, the NBC camera crew, the uninvited media guests, not only invaded the Millers' bedroom without Dave Miller's consent, they also invaded the home and privacy of his plaintiff wife, Brownie Miller, referred to by Norte in his deposition as "a woman in the hallway." Not only was the "woman in the hallway" Dave Miller's wife, the hallway was a part of her home, a place where NBC had no right to be without her consent.

In the context of Fourth Amendment search and seizure law as applied in a criminal case, the California Supreme Court has observed that former case law had reflected "the now defunct community property principle that management and control of real and personal property are vested in the husband. (Former Civ. Code, §§ 162a, 172a, repealed by Stats. 1969, ch. 1608, § 3, p. 3313). Under present law a wife possesses independent and coequal authority to consent to a search of commonly occupied areas. (See Civ. Code, § 5105.)" (*People v. Haskett* (1982) 30 Cal.3d 841, 857, fn. 5 [180 Cal.Rptr. 640, 640 P.2d 776].) This view does not merely result from

---

[8]Accord, *Coverstone v. Davies* (1952) 38 Cal.2d 315 [239 P.2d 876], cert. den. *Mock v. Davies* (1952) 344 U.S. 840 [97 L.Ed. 653, 73 S.Ct. 50] (affirming judgments entered after nonsuits on grounds that plaintiffs could not recover for invasion of privacy based upon publicity regarding the arrest of their son); *Hendrickson v. California Newspapers, Inc.* (1975) 48 Cal.App.3d 59 [121 Cal.Rptr. 429] (holding that a mother and daughter could not maintain a cause of action for invasion of privacy or intentional infliction of emotional distress based upon a published obituary reciting allegedly private facts about their husband/father); *James v. Screen Gems, Inc.* (1959) 174 Cal.App.2d 650 [344 P.2d 799] (holding that a widow had no cause of action for invasion of privacy based upon the television film portrayal of her deceased husband, Jesse James, Jr.); *Kelly v. Johnson Publishing Co.* (1958) 160 Cal.App.2d 718 [325 P.2d 659] (affirming a demurrer sustained without leave to amend to a complaint brought by two sisters for invasion of privacy based upon a newspaper article about their deceased brother); *Metter v. Los Angeles Examiner* (1939) 35 Cal.App.2d 304 [95 P.2d 491] (affirming judgment entered upon defendant's motion for directed verdict where plaintiff sued for invasion of privacy based upon a detailed newspaper article about the suicide of his wife).

recent changes in women's status; an early case, *Young* v. *Western & A. R. Co.* (1929) 39 Ga.App. 761 [148 S.E. 414], held that a wife was also injured by a trespass onto property of her husband and herself.

Thus, the defendants' invasion of plaintiff wife's rights *was* direct and personal to her; therefore, it is also consistent with *Vescovo* v. *New Way Enterprises, Ltd.* (1976) 60 Cal.App.3d 582 [130 Cal.Rptr. 86], where it was held that the 14-year-old daughter *residing in the house* had a *recognizable privacy interest to be free of intrusion there*.

III.

PLAINTIFF WIFE'S CAUSE OF ACTION FOR THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff wife seeks redress for the intentional infliction of emotional distress by defendants. ██ "The elements of a prima facie case for the tort of intentional infliction of emotional distress were summarized in *Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975] [citation], as follows: '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard [for] the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'" (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 209 [185 Cal.Rptr. 252, 649 P.2d 894].)

Just as defining the parameters of the right of privacy from intrusion requires a reviewing court to make a preliminary determination, the tort of intentional infliction of emotional distress requires the same process of definition; in this instance, it requires consideration of what constitutes "extreme and outrageous conduct." We approach the problem by employing the abstract but useful standard of how reasonable people might view such conduct, excluding from that category those either overly sensitive or callous.

The key to analysis of the facts before us was the trespass committed by the NBC camera crew in crossing the threshold of a private residence without, apparently, even a moment's hesitation. The record contains no evidence that crew members, including the producer, Norte, had any specific malicious or evil purpose. Here, the record discloses that the NBC camera crew apparently devoted little or no thought whatsoever to its obvious transgression.

 "Little or no thought" constitutes, in this context, "reckless disregard" of the rights and sensitivities of others. We are not unmindful of Norte's testimony that before invading the Miller house, he and the camera crew had done the same thing at other private places without any negative expression from those invaded. This conduct does not establish the complaint in this case as that of overly sensitive people. It illustrates, perhaps, a widespread loss of certainty about where public concerns end and private life begins, and a loss of personal identity manifested by individual members of the public when confronted by aggressive media representatives. Personal security in a society saturated daily with publicity about its members requires protection not only from governmental intrusion, but some basic bulwark of defense against private commercial enterprises which derive profits from gathering and disseminating information.

With respect to plaintiff wife's cause of action, we leave it to a reasonable jury whether the defendants' conduct was "outrageous." Not only was her home invaded without her consent, but the last moments of her dying husband's life were filmed and broadcast to the world without any regard for the subsequent protestations of both plaintiffs to the defendants. Again, the defendants' lack of response to these protestations suggests an alarming absence of sensitivity and civility. The record reflects that defendants appeared to imagine that they could show or not show Dave Miller in extremis at their pleasure, and with impunity.

So it was that plaintiff wife, weeks after the event, was watching her television set on a Wednesday morning and saw an intensely private event, meaningful only to her and a few others in a personal way, as filmed by an NBC crew who had no right to be where they were when they filmed it. It is immaterial that in defendants' judgment (expressed by Norte in his deposition testimony) that upon review of the film in question, the body of Dave Miller was not identifiable *by the average viewer*. Plaintiff wife was not an average viewer, a member of the general viewing public; the film depicted her house and her husband, and that fact was known to her.

She has stated a cause of action for the intentional infliction of emotional distress unless precluded by the defense of First Amendment privilege. (See "Constitutional Rights," *post,* p. 1489.)

IV.

PLAINTIFF DAUGHTER'S CAUSES OF ACTION

 We hold, however, that plaintiff daughter has stated neither a cause of action for intrusion of her right of privacy nor for the intentional infliction of emotional distress.

 With respect to her asserted privacy invasion, she was not present when the invasion of her parents' household occurred nor did those premises belong to her. By way of contrast, the right of privacy upheld in *Vescovo, supra,* 60 Cal.App.3d 582 was based on facts showing the direct and personal intrusions into a teenaged daughter's *household* caused by the defendant.

In the case at bench, the daughter's claims of injury fall within the policy limitation of *Flynn* v. *Higham, supra,* 149 Cal.App.3d 677, because the principal thrust of the daughter's claims were due to her *relationship* to the victims of the defendants—her parents—rather than the defendants' conduct toward her.

Plaintiff daughter argues on this appeal that the *broadcasts* of her father's dying moments into her home in and of themselves constituted "photographic intrusions" as to her, coming within the ambit of invasion of privacy by intrusion. We do not hold that such intrusion could not conceivably occur, but delineation of a tort of this nature must await more appropriate circumstances. *Flynn* precludes claims by *relatives* of victims wronged by *publicity* as a matter of sound policy. It precludes her action here.

 The *Flynn* rationale is equally applicable to plaintiff daughter's cause of action for the intentional infliction of emotional distress; the same consideration, that of placing a reasonable limitation on liability, governs this claim as well. There are relatively few successful prosecutions of this tort because, by its very definition, the law limits claims of intentional infliction of emotional distress to egregious conduct toward plaintiff *proximately caused* by defendant. We need not address with particularity the proximate cause problem raised by television broadcasting, since plaintiff daughter's claim is not based in the first instance on conduct sufficiently egregious with respect to her.

## V.

### CONSTITUTIONAL RIGHTS

Defendants have vigorously defended against liability in the instant case, relying, in addition to *Flynn,* on two propositions: (1) that by calling for the paramedics, the Millers impliedly consented to the entry of the NBC camera crew and (2) plaintiff wife's cause of action was precluded by NBC's constitutionally recognized and protected First Amendment right to gather news.

 The first proposition is devoid of merit. One seeking emergency medical attention does not thereby "open the door" for persons without

any clearly identifiable and justifiable official reason who may wish to enter the premises where the medical aid is being administered. In *Dietemann v. Time, Inc., supra,* 449 F.2d 245, the court held that newsgatherers cannot immunize their conduct by purporting to act jointly with public officials such as the police or paramedics. The clear line of demarcation between the public interest served by public officials and that served by private business must not be obscured.

The second argument, however, merits discussion. As a preliminary matter, we note that conceptually speaking, as noted First Amendment scholar Melville R. Nimmer has stated, with respect to the Prosser categories of privacy rights, both "intrusion" and "appropriation" may be "put to one side . . . . Intrusion does not raise first amendment difficulties since its perpetration does not involve speech or other expression. It occurs by virtue of the physical or mechanical observation of the private affairs of another, and not by the publication of such observations. The appropriation form of privacy invasion probably also does not raise first amendment problems, although here speech and other expression is involved." (Nimmer, *The Right to Speak From Times to Time: First Amendment Theory Applied to Libel and Misapplied to Privacy* (1968) 56 Cal. L.Rev. 935, 957.)

We will, however, explore defendants' contention, since the events upon which this litigation was based involved both "physical observation of the private affairs of another" and the filming and dissemination of the physical observation.

Defendants are not alone in enjoying some constitutional protection for their pursuits. Individual ordinary citizens also enjoy certain protections, one of which is to be left alone in their own homes except under carefully prescribed circumstances. As *Galella* v. *Onassis, supra,* 353 F.Supp. 196, observed, the individual's right to be let alone permeates the federal Constitution in a number of different ways. "The Constitution itself creates a right of privacy. The First Amendment protects the right of freedom of association. The Fourth Amendment protects the individual from unreasonable searches and seizures. The Fifth Amendment and its privilege against self-incrimination safeguards the individual in a zone of privacy into which the Government may not intrude, and the Ninth Amendment provides that the enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people." (*Id.,* at p. 231.)

In California, the voters enacted, on November 5, 1974, article I, section 1 of the California Constitution, which provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting

property, and pursuing and obtaining safety, happiness, *and privacy.*" (Italics added.) The voters were actually reenacting a provision that had long been a part of the California Constitution's declaration of rights. As early as 1931, *Melvin* v. *Reid* (1931) 112 Cal.App. 285, 291 [297 P. 91] recognized California's dedication to privacy rights. The 1974 enactment *expressly* added "privacy" to the California Constitution.

As *White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222] explained, the 1974 amendment which was approved by the voters was presented to voters as a necessary protection against some perceived "mischiefs," including "(1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records."

*White* v. *Davis* held that the amendment was "intended to be self-executing, i.e., that the constitutional provision, in itself, 'creates a legal and enforceable right of privacy for every Californian.'" (*Id.*, at p. 775.) █ While primarily aimed at unreasonable intrusion by governmental and business interests into people's private affairs, the California Supreme Court recently stated that despite this emphasis on the scope of the constitutional right of privacy, "the right to privacy has been held to protect a diverse range of personal freedoms. [Citations.]" (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 213 [211 Cal.Rptr. 398, 695 P.2d 695].) We are of the view that it encompasses the rights of plaintiff wife in the present case, both those personal and those of property.

We assume, for the purpose of discussion here, that public education about paramedics, as well as about the use of cardio-pulmonary resuscitation (CPR) as a life-saving technique almost anyone might either need or be called upon to administer to another, qualifies as "news."

The First Amendment of the United States Constitution declares that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." The protection afforded the disseminators of the news, be they reporters, broadcasters or television newspersons, has been perceived throughout our history as of the utmost importance in maintaining a free society. The protection extends not only to prohibit direct state action, but must be considered when any private citizen seeks to impose civil liability for invasion of privacy by the press or media through access to state courts.

(*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412].)

 Newsgathering, as well as news dissemination, may be within the protective ambit of the First Amendment. *Branzburg* v. *Hayes* (1972) 408 U.S. 665, 681 [33 L.Ed.2d 626, 639, 92 S.Ct. 2646], observed that "without some protection for seeking out the news, freedom of the press could be eviscerated." A series of United States Supreme Court decisions have upheld the right of the press and media to publish information contained in *public* records or obtained during *public* proceedings, as part of the public's right to know. (See, e.g., *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029].) California, on First Amendment grounds, has extended the right to gather news without the burden of civil liability to certain heretofore "confidential" proceedings involving assessment of the qualifications of judicial candidates. (*Nicholson* v. *McClatchy Newspapers* (1986) 177 Cal.App.3d 509 [223 Cal.Rptr. 58].)

Where the United States Supreme Court has addressed the problem of providing adequate constitutional protection for newsgathering, however, it has been careful to point out that the protection is limited, rather than absolute. *Branzburg,* for example, cited with approval the statement that "'[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.' *Associated Press* v. *NLRB,* 301 U.S. 103, 132-133 (1937)." (*Branzburg* v. *Hayes, supra,* 408 U.S. 665, 683 [33 L.Ed.2d 626, 640].) Implicit in *Cox* and other decisions upholding newsgatherers' access to public records assumed that the newsgathering activity was lawful, rather than unlawful. *Nicholson* notes that the protection extended for newsgathering does not mandate "that the press and its representatives are immune from liability for crimes and torts committed in news gathering activities simply because the ultimate goal is to obtain publishable material. . . ." (*Nicholson* v. *McClatchy Newspapers, supra,* 177 Cal.App.3d 509, 518.)

The same observation was made in *Dietemann* v. *Time, Inc., supra,* 449 F.2d 245, 249, in the following particularly appropriate language: "We agree that newsgathering is an integral part of news dissemination . . . [but] [t]he First Amendment has never been construed to accord newsmen immunity from *torts* or crimes committed during the course of newsgathering. The First Amendment is not a license to *trespass,* to steal, or to intrude by electronic means into the precincts of another's home or office. [Fn. omitted.]" (Italics added.)

 We conclude, in the case before us, that the obligation not to make unauthorized entry into the private premises of individuals like the Millers

does not place an impermissible burden on newsgatherers, nor is it likely to have a chilling effect on the exercise of First Amendment rights. To hold otherwise might have extraordinarily chilling implications for all of us; instead of a zone of privacy protecting our secluded moments, a climate of fear might surround us instead. Others besides the media have rights, and those rights prevail when they are considered in the context of the events at the Miller home on October 30, 1979.

In summary, we hold that plaintiff wife, Brownie Miller, has stated three causes of action against defendants and that since there are triable issues of material fact, the trial court erred in awarding summary judgment to defendants as to plaintiff wife, Brownie Miller. The trial court's award of summary judgment to defendants on those causes of action pleaded by plaintiff daughter Marlene Miller Belloni was correct and is hereby affirmed.

## DISPOSITION

The judgment as to plaintiff Miller's causes of action is reversed. The judgment as to plaintiff Belloni's cause of action is affirmed. Plaintiff Miller is to recover her costs.

Spencer, P. J., and Ruiz, J.,* concurred.

Petitions for a rehearing were denied January 12, 1987, and the petitions of appellant Belloni and respondents for review by the Supreme Court were denied March 11, 1987.

---

*Assigned by the Chairperson of the Judicial Council.