**OLO LETULI, Plaintiff**

**v.**

**MATT LE'I, Defendant**

High Court of American Samoa
Land and Titles Division

LT No. 13-91

September 4, 1992

Before RICHMOND, Associate Justice, TAUANU'U, Chief Associate Judge, and LOGOAI, Associate Judge.

Counsel:     For Plaintiff, William H. Reardon
             For Defendant, Gata E. Gurr

Plaintiff Letuli commenced this action on March 14, 1991, to obtain: (1) preliminary and permanent injunctions enjoining defendant Le'i and associated persons from trespassing on, encroaching upon, and causing any damage to plaintiff's individually owned land in an area known as Fogagogo in American Samoa; (2) special, general, and exemplary or punitive damages for defendant's acts of trespass allegedly occurring in February and March of 1991; and (3) attorney's fees and costs of suit. The order to show cause on plaintiff's application for a preliminary injunction was heard on April 3, 1991, and was continued to April 9, 1991, for further hearing, with the Court's advice to defendant to retain an attorney. On April 9, 1991, defendant appeared by counsel, and after further hearing, the Court denied the application for a preliminary injunction and urged the parties to work out their differences in some manner. Any efforts to that end apparently failed, and trial was held on June 30 and July 1, 1992. The Court inspected the area immediately at issue on July 1, 1992.

## FINDINGS OF FACT

In 1962, plaintiff owned and surveyed, as his individually owned land, approximately 44 acres of land in a roughly triangular shape in the area known as Fogagogo in American Samoa. At the present time, this land is bounded on the north side by a paved road to the part of the land commonly known as "Freddie's Beach," where plaintiff's residence is

78

located, and on the west side by a dirt road extending from the northwest corner to the southwest corner, which is near the ocean, of the land. The boundary from the northeast corner to the southwest corner runs along the ocean front.

Over the years, plaintiff has conveyed parcels within this acreage to various persons. In 1977, he deeded a parcel of approximately 2.98 acres to Ethel T.W. Fujii (Fujii deed). In 1978, he transferred two contiguous parcels to the north of the Fujii parcel, each about one acre, to Oliver E. Moors. The Fujii deed and the deed of the southerly acre of the two Moors parcels (Moors deed) contain grants of the land, together with all rights, easements, and appurtenances belonging or in any way incident or appertaining to the land. Both the Fujii and Moors parcels are bounded on the west side by, and are accessible from, the north-south dirt road.

Plaintiff left a 12-foot right of way between the Moors and Fujii parcels, which is indicated in the deed of Moors' southern one-acre parcel. This right of way provides access to plaintiff's land east of these parcels, as well as to two other parcels which plaintiff conveyed to other persons. Plaintiff's stated intent was then, and still is, that the use of this 12-foot right of way be exclusive to him and the owners of these two other parcels.

To the south of the Fujii parcel, along the north-south dirt road and extending to the southwest corner of the original acreage, plaintiff conveyed two more parcels to Moors, totaling about 2.83 acres. Immediately to the east of these two parcels and the Fujii parcel are the two parcels having access rights through the 12-foot right of way.

In due course, Moors subdivided his two-acre parcel north of the Fujii parcel into five lots. He deeded one lot, containing approximately .54 of an acre and located in the southeastern portion of the Moors parcel, to defendant (Le'i deed). This transaction occurred on August 5, 1983. The grant of the land in the deed also includes all rights, privileges, and easements held or enjoyed in connection with, or appurtenant to the land. Moors conveyed the northern lot of this subdivision, extending the full west to east width of two-acre parcel, to another person. The three southwestern lots were conveyed to a third person.

Defendant's lot is presently landlocked, unless the 12-foot right of way between the Moors and Fujii parcels, or a right of way across

one or more of the lots owned by Moors' other two grantees, is available for his use. Moors represented to defendant that the 12-foot right of way was defendant's access to this lot. Moors regularly accessed his parcel from both the north-south dirt road and the 12-foot right of way before he sold his subdivision lots. Defendant and at least the third buyer used the 12-foot right of way to enter their property. Plaintiff testified that he did not know that Moors would subdivide the two-acre parcel until the lots had been transferred to defendant and the other two third parties.

The main event took place in February of 1991 when defendant contracted with Samoa Maritime, Co. to clear his lot with a bulldozer in preparation for the construction of his family's new home. This work was accomplished in one day, according to the bulldozer operator, or two days, according to defendant. In any event, it was completed on or about February 20, 1991, the date of Samoa Maritime's invoice of $670 for the work.

Defendant had shown the operator's superior the area to be cleared and a survey of his lot on the day before the work began. The operator, who is Samoa Maritime's heavy equipment supervisor and who did this job himself because he was short-handed on regular operators, arrived at the site about 8:00 a.m. the next morning. In order to bring the bulldozer to the lot, it was necessary to off-load the bulldozer from the hauling trailer at the north end of the dirt road and drive it down that the road and across the 12-foot strip. Defendant arrived between 8:30 and 9:00 a.m. and showed the boundaries of his lot to the operator. The operator visibly saw two pins along the 12-foot strip, and defendant pointed to a third pin at the easterly corner where his lot and the northern lot meet. They did not walk the four corners of defendant's lot. Defendant told the operator to cut and level at various places on his land, to stay within his property and out of plaintiff's property, and to pile the debris on his lot near the northern lot to fill a depression.

At this point, defendant left the site, and the operator's and defendant's versions of subsequent events differ at least in one material respect. Defendant stated that he returned about 1:00 p.m. to find the bulldozer inoperative, the operator gone, and the job less than one-half done. He next returned to the site about noon the following day, at which time the work had been completed and the bulldozer had been removed from the area. According to the operator, the work was completed on the first day, and the defendant was happy with it when he returned to the site between 4:00 and 4:30 p.m.

80

Both the operator and defendant tended to minimize any encroachment onto plaintiff's land. The operator indicated that the area to the east of defendant's land was mostly covered with four to five foot bushes and other growth. He testified that the boundary between plaintiff's and defendant's lands was not clearly discernible to him, but he may have driven the bulldozer onto plaintiff's land. He admitted to cutting down some small pandamus trees, including eight or so which may have been outside of defendant's land, and some six larger trees, including two futu trees, of which perhaps four could have been outside defendant's land.

Defendant testified that there were no large trees in the area directly between his property and the ocean, only small pandanus trees and various shrubs. He admitted that the bulldozer went into plaintiff's land, probably 20 to 25 feet, during turning around movements. He stated that only one large tree on his land and no such trees on plaintiff's land were destroyed during the clearing procedure, and except for hurricane damage later in 1991, plaintiff's land was substantially the same now as it was immediately after the bulldozing. A pile of rocks, one foot or so in diameter, was left near the southeast corner of his lot for later use. All other debris was deposited as he had instructed the operator.

Plaintiff and his wife were in Australia at the time defendant's lot was bulldozed. They first learned about the clearing operation from Moors after they returned. When they inspected the area, they were appalled and extremely upset at the damage done to plaintiff's land. Defendant's land was cleared and most of the vegetation from plaintiff's land to the ocean front was cut down. Lost were two futu trees, two small coconut trees, a banyan tree, and many pandanus trees. Bushes have come back, but no trees.

Both plaintiff and his wife testified that plaintiff did not give defendant permission before the bulldozing episode to clear any portion of plaintiff's land. Plaintiff's wife talked to defendant after this event. She told defendant of plaintiff's and her anger and distress over the incident. She said that, in response, defendant chuckled and stated that someone else must have instructed the bulldozer operator to clear the area on plaintiff's land.

Visual inspection revealed that a substantial portion of plaintiff's land from defendant's lot to the ocean-shoreline boundary had been cleared. Tree stumps were observed, as were a large number of

81

pandanus branches on the ground. The ocean view from defendant's lot was notably improved. Bush vegetation has grown back, but there was no significant sign as yet of natural tree restoration in the 16 months or so since the clearing occurred.

A further controversy pertains to the power-line poles which have been installed by the American Samoa Power Authority (ASPA) along the 12-foot right of way to provide electric power to defendant's new home. Defendant obtained a deed of easement form, which ASPA uses to acquire, as grantee, an easement for electrical and power-service lines to private property from the owner or lessee of that property, as grantor. On February 8, 1989, defendant took this form to plaintiff, who signed it and is identified in the form as the landowner. According to defendant, Moors was unavailable at the time. Defendant signed the form as well and is identified in the form as lessee of the land. Plaintiff was not clear on all the circumstances surrounding execution of this easement, which defendant stated took place at plaintiff's new home at "Freddie's Beach" on a Saturday morning, but admitted signing the form. Plaintiff also claimed that he thought he was granting an easement to Moors, not ASPA, to have power-line poles installed along the north-south dirt road to Moors' two-acre parcel. In fact, the easement in evidence is not signed on ASPA's behalf. However, since poles have been erected along the 12-foot right of way, ASPA presumably has the original or a copy completed to its satisfaction. Moreover, the real factual concern now is whether the poles are within defendant's and his western neighbor's lots or are within the 12-foot right of way. Visual inspection did not determine whether or not any of the power-line poles are located on the right of way.

## DISCUSSION

### 1. Trespass on plaintiff's land.

The tort of trespass to land is the unlawful interference with its possession. W. Prosser and W. Keeton, *The Law of Torts* § 13, at 70 (5th ed. 1984). It may be committed as the result of an act which is intentional, reckless, or negligent, or as the result of ultrahazardous activity. *Gallin v. Poulou*, 295 P.2d 958, 959-62 (Cal. App. 1956). The only intent required is the intent to enter another's land, regardless of the actor's motivation. *Miller v. National Broadcasting Co.*, 232 Cal. Rptr. 668, 676-77 (Cal. App. 1986). Trespass may occur by causing the entry of some other person or thing. *Restatement (Second) of Torts* § 158(a), at 277 (1965). As a general principle, the employer of an independent

82

contractor is not liable for physical harm done by the contractor or the contractor's employees. *Id.* at § 409, at 370. However, liability flows when an independent contractor is hired to do work which the employer knows or has reason to know or recognize that, in the ordinary course of doing the work in a usual or prescribed manner, is likely to result in trespass. *Id.* at § 427B, at 419-20.

The clearing of defendant's land by the bulldozer operator on or about February 20, 1991, involved clear acts of trespass to plaintiff's land. Defendant recognized the risks of trespass to plaintiff's land when he discussed the work to be done with the operator's supervisor and pointed out to the operator, at least partially, the boundaries of his lot and, he said, cautioned the operator to keep the bulldozer and debris within his lot. Although the operator was an employee of an independent contractor hired to clear the land, the situation in this action is squarely within the exception imposing liability on the employer of an independent contractor who is employed to perform work likely to result in trespass. Thus, defendant is liable to plaintiff for the physical harm done by the bulldozer operator's trespass to plaintiff's land.

### 2. *Defendant's rights in plaintiff's land.*

There is no doubt that the bulldozer's excursions beyond the boundaries of defendant's lot trespassed upon plaintiff's land. However, if defendant has any rights to use the 12-foot right of way, there has been no unlawful encroachment by defendant in this area of plaintiff's land, unless the operation of the bulldozer across or placement of any of the power-line poles within the right of way exceeded defendant's authority in the exercise of those rights.

When an owner of two adjacent parcels of land conveys one of them, or when the owner of a parcel of land conveys a part of it, the grantee takes the land with all benefits that appear at the time of the transfer to belong to the land. *Fristoe v. Drapeau*, 215 P.2d 729 (Cal. 1950). The purpose of recognizing implied easements is to carry out the intent of the parties in light of all the circumstances. *Id.* at 730. Relevant circumstances include, but are not necessarily limited to, the visibility and permanency of the easement on the servient estate, reasonable necessity of the easement, actual use of the easement at the time of the transfer, and reasonably foreseeable uses of the easement. *Id.* at 730-31.

The Fujii deed, Moors deed and Le'i deed contain general references to easements and other benefits related to the land conveyed and thus evidence the parties' clear intent to convey such benefits with the land in each instance. The 12-foot right of way was created along with the Moors-deed transaction. It is both visible and permanent. Its purpose in providing access to plaintiff's land and the two landlocked parcels to the south at the time of the Moors deed is manifest.

The parties' intention to provide an alternative means of entrance to the Fujii and Moors parcels at the time of the deed is less certain. However, despite plaintiff's protestation that he intended in 1978 to exclude use of the 12-foot right of way other than to his land and the other two parcels, we are satisfied that this intent did not crystallize until the bulldozing incident in 1991. During the interim, it is apparent that at least Moors, defendant and defendant's western neighbor used this means to their land without any objection from plaintiff. It was certainly foreseeable in 1978, especially given the sizeable acreage, almost six acres, conveyed to Moors and the configuration of his parcels, that Moors might some day subdivide his parcels and create lots reasonably requiring entrance over the 12-foot right of way. This was unquestionably Moors' and defendant's expectations at the time of the Le'i deed.

It is true, of course, that defendant might be able to establish entitlement to a right of way across lots which Moors conveyed to the other two transferees of Moors' two-acre parcel. *Sese v. Leota*, 9 A.S.R.2d 25 (1988). This alternative tends to diminish reasonable necessity as a factor supporting defendant's use of the 12-foot right of way. However, we think that the unobjected use of the 12-foot right of way by Moors for some 13 years and by defendant for some eight years, along with the foreseeability of landlocked subdivision lots, is indicative of not only mutual intent to allow use of the 12-foot right of way for the benefit of both the Fujii parcel and the Moors two-acre parcel, but also of the practical and, therefore, reasonable necessity for use of this passage to defendant's lot. We do not think that Moors and his other grantees should or need to be shouldered with this burden in this particular situation.

Under all the circumstances of this case, an implied easement across the 12-foot right of way was created in connection with the Moors-deed transaction in 1978 for the benefit of the Fujii parcel and the Moors two-acre parcel, and any future subdivision lots of either parcel which are contiguous to the 12-foot right of way. Thus, defendant has

an implied easement to enter his lot by crossing the 12-foot right of way on plaintiff's land. It follows that there was no actionable trespass when the bulldozer traversed along the 12-foot right of way to reach and leave defendant's lot on or about February 20, 1991.

The power-line poles, however, are a different matter. A 12-foot easement is not well suited for handling both motor vehicles and power-line poles, and, in any event, there is no evidence showing any mutual intent to locate utility lines within this right of way. There also appears to be some uncertainty as to whether or not any of the power-line poles now in place are within the 12-foot right of way. It is defendant's obligation to ensure that any such encroachment either has not occurred or is corrected.

### 3. *Damages.*

The usual remedy for harm to land resulting from a past trespass and not amounting to total destruction of the value of the land is compensation (1) measured by diminution in value, i.e., the difference between the market value of the land before and after the harm or, when appropriate, the cost of restoration that has been or may be reasonably incurred, (2) for loss of use of the land, and (3) for discomfort and annoyance to the occupant of the land. *Restatement (Second) of Torts* § 929(1), at 544 (1979). If a severable thing attached to the land is damaged, recovery of the loss in market value to the attachment rather than damage to the land as a whole is an optional approach. *Id.* at § 929(2), at 544.

If a trespass involves a continuing invasion on the land, damages may be recovered for both the past invasions and either the decrease in the value of the land caused by the prospect of the continuing invasions or the owner's cost of avoiding future invasions. *Id.* at § 930, at 548.

Compensatory damages for harm to land require proof of the pecuniary loss outlined in the principles stated above. In the absence of such proof, which can occur when substantial actual damages are not susceptible to precise proof, the damage entitlement is limited to nominal damages in a trivial amount. *Id.* at § 907, at 462-63.

However, even if only nominal damages can be awarded, there may be recovery for punitive or exemplary damages, whether the trespass involves either substantial harm without satisfactory proof of pecuniary loss or no harm. *Id.* at § 908 & comments b & c, at 464-65.

Punitive or exemplary damages are intended to punish a wrongdoer and deter him and others from similar, future misconduct, based on outrageous conduct shown by acts done with evil motive or reckless indifference to others' rights. *Id.* at § 908 & comments a & b, at 464-65. Among the circumstances to consider are the character of a defendant's act and the nature and extent of a plaintiff's harm which the defendant caused or intended to cause. *Id.* at § 908(2) & comment e, at 464, 466-67.

The evidence in this action clearly shows substantial damage to the part of plaintiff's land which defendant caused to be bulldozed. It also shows that one or more power-line poles may constitute a continuing trespass on the 12-foot right of way. However, in both respects, the evidence is devoid of proof of the amount of plaintiff's pecuniary loss from either the past or any continuing invasions. The trees severed were natural growth and appear to lack market value or other readily ascertainable value. We do not think plaintiff's anger and distress are compensable in the absence of satisfactory proof of any consequential serious illness or significant bodily or emotional injury. This lack of compensatory-damage proof limits the award of damages to nominal damages of a trivial amount, traditionally $1.

The evidence does show, however, that the act done on defendant's behalf was reprehensible and outrageous. The extent of the bulldozing on plaintiff's land is inexcusable and attributable to reckless disregard of plaintiff's rights, if not malicious retribution for plaintiff's refusal to permit clearing to improve defendant's ocean view. Taking into account the character of defendant's act, the nature of plaintiff's harm, and defendant's responsible station in life, we think that defendant's act warrants an award of punitive or exemplary damages in the sum of $1,500.

### 4. *Injunctive relief.*

Injunctive relief is usually inappropriate for past acts of trespass, as the remedy at law of damages is adequate. *Lutu v. Fuimaono*, 4 A.S.R. 450 (1964). However, a continuing trespass that can be abated is properly eliminated by injunctive relief, which is permitted in addition to proven compensatory damages in a jurisdiction abolishing the distinction of actions in law and equity such as this one. *Restatement (Second) of Torts* § 951, at 626-27. Defendant can readily determine whether or not any of the power-line poles are located within the 12-foot right of way and relocate any offending poles to a proper area.

# CONCLUSIONS OF LAW

1. Defendant owns an implied easement incidental to his lot over the 12-foot right of way as the means of ingress to and egress from his lot. This implied easement does not include utility lines on, over, or beneath the surface of the right of way.

2. Passage of the bulldozer over the 12-foot right of way on or about February 20, 1991, did not constitute a trespass to plaintiff's land.

3. Defendant is liable to plaintiff for the trespass to plaintiff's land, other than to the 12-foot right of way, by the bulldozer-clearing operation on or about February 20, 1991.

4. Any power-line poles located within the 12-foot right of way constitute a continuing trespass to plaintiff's land.

5. There is no proof of compensatory damages. Plaintiff is only entitled to nominal damages, which are assessed at $1.

6. The trespass by the bulldozer clearing operation on or about February 20, 1991, was caused by reckless indifference, if not maliciousness, by defendant. Plaintiff is awarded punitive or exemplary damages in the sum of $1,500.

7. Plaintiff is entitled to have defendant, at defendant's sole expense, correctly locate the southern boundary of defendant's and his neighbor's lots by resurvey or other appropriate means, and remove or cause to be removed any power-line poles erected within the 12-foot right of way. Defendant is so enjoined.

8. Plaintiff has shown no basis for an award of attorney's fees or costs of suit, and such an award is denied.

Judgment shall be entered accordingly.

It is so ordered.