[No. B154688. Second Dist., Div. Four. Nov. 18, 2003.]

ROBERT MARICH et al., Plaintiffs and Appellants, v.
MGM/UA TELECOMMUNICATIONS, INC., et al., Defendants and
Respondents.

418

**COUNSEL**

Watts & Associates, Laurence W. Watts; and Evan D. Marshall for Plaintiffs and Appellants.

Akin, Gump, Strauss, Hauer & Feld, Mirah A. Horowitz and Rex S. Heinke for Defendants and Respondents.

OPINION

HASTINGS, J.—

## BACKGROUND

Appellants Robert and Marietta Marich brought this action in 1997, against QRZ Media, Inc., MGM/UA Telecommunications, Inc., and Metro Goldwyn Mayer, Inc., respectively, the producers and distributors of a television show entitled, *LAPD: Life on the Beat.* The show was videotaped by a QRZ-employed crew consisting of a camera operator and a soundman who rode on patrol with officers of the Los Angeles Police Department. On October 20, 1996, the crew videotaped two officers as they responded to a call to the apartment of appellants' son, Michael Marich, where he was found dead.

While the television crew videotaped, one of the policemen, Officer Jackson, telephoned appellants at their home in Texas. The result of the videotaping was a four-minute segment in an episode of the show entitled, "The Final Act." Officer Jackson's telephone call to appellants appears in the episode. He is seen and heard speaking first to appellant Marietta Marich, then to appellant Robert Marich, informing them, without identifying appellants or their son by name, that the police discovered their son dead in his apartment of an apparent drug overdose. While the words spoken are unintelligible, appellants' responses are audible, and clearly register shock and anguish.

After the show was broadcast, appellants brought this action, and it was consolidated with appellants' action against the City of Los Angeles regarding the same show. The complaint sets forth causes of action for intentional infliction of emotional distress, common law invasion of privacy, based upon intrusion and public disclosure of private facts, and statutory invasion of privacy, based upon Penal Code sections 631, 632, and 634. After the trial court granted the respondents' anti-SLAPP motion and dismissed the action pursuant to Code of Civil Procedure section 425.16, we reversed the judgment of dismissal and the matter was remanded for trial.[1]

In June 2001, QRZ Media, Inc., filed a Chapter 7 bankruptcy petition, staying the action with regard to that defendant, and jury trial commenced on July 5, 2001, against the remaining defendants, including respondents in this appeal, MGM/UA Telecommunications, Inc., and Metro Goldwyn Mayer, Inc., on the causes of action for common law invasion of privacy based upon

---

[1] See *Marich v. QRZ Media, Inc.* (July 2, 1999, B122834), opinion ordered nonpublished October 20, 1999.

intrusion, and statutory invasion of privacy, based upon Penal Code section 632. The theory of the case was that the improper recordings combined with the subsequent publication of the conversations resulted in damages to appellants. The jury's deliberations began on July 24, 2001, and were quite eventful, with requests from the jury for rereading of testimony, further argument, and multiple questions, nearly all involving the meaning of the word *intentional*.

On July 26, 2001, after the jury indicated to the court that it might be deadlocked, one of the jurors was excused due to a prepaid family vacation, and the jury was instructed to begin deliberations anew. When the jury again indicated that it was deadlocked, the court discussed with counsel the advisability of giving an "Allen charge."[2] The court answered the jury's questions, permitted additional argument, and provided the rereading of requested testimony. Appellants' counsel then proposed an additional instruction with regard to intent, which was refused by the court.

Deliberations resumed, and the jury again reported that it was deadlocked, eight to four. The parties stipulated to accepting a verdict based on a vote of eight to four, instead of nine to three. The "Allen charge" was not given.

The jury returned special verdicts on each of the two causes of action. With regard to the common law intrusion theory, the jury answered "no" to the following question: "Did any employee of QRZ Media, acting within the scope of his or her employment, intentionally intrude into Robert Marich's solitude, seclusion, private affairs or concerns, specifically with respect to Robert Marich's side of the telephone death-notification conversation with Officer Jackson on October 20, 1996?"

With regard to the statutory claim based on Penal Code section 632, the jury answered three questions as follows: "11. Did any employee of QRZ Media, acting within the scope of employment, record or eavesdrop upon Robert Marich's side of a confidential communication without Robert Marich's consent? [¶] Yes. [¶] 12. Did that person use an electronic amplifying or recording device? [¶] Yes. [¶] 13. Did that person do so intentionally, and not inadvertently or by chance? [¶] No."

Judgment was entered in favor of respondents on September 20, 2001, and appellants filed a timely notice of appeal.

---

[2] See *Allen v. United States* (1896) 164 U.S. 492, 501 [41 L.Ed. 528, 17 S.Ct. 154]; and see generally *People v. Moore* (2002) 96 Cal.App.4th 1105, 1120–1121 [117 Cal.Rptr.2d 715].

## DISCUSSION

### 1. *Definition of Intent*

Appellants contend that the trial court gave erroneous jury instructions with regard to the element of intent for both the statutory and common law causes of action for invasion of privacy; and that the erroneous instructions had the effect of incorrectly placing the burden on them to prove absence of mistake or inadvertence.

■ The elements of both the statutory invasion of privacy and common law invasion of privacy include *intentional* conduct. Penal Code section 632 prohibits the *intentional* eavesdropping to a confidential communication by means of any electronic amplifying or recording device, without the consent of all parties. The common law cause of action for invasion of privacy based upon intrusion "has two elements: (1) [intentional] intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 214, 231 [74 Cal.Rptr.2d 843, 955 P.2d 469].) "It encompasses . . . unwarranted sensory intrusions such as eavesdropping. . . . [Citation.]" (*Id.* at pp. 230–231.)

"[T]he word 'intentional' has been the subject of widely differing interpretations, depending on context and apparent legislative intent. [Citations.] . . . [T]he recording of a confidential conversation is intentional if the person using the recording equipment does so with the purpose or desire of recording a confidential conversation, or with the knowledge to a substantial certainty that his use of the equipment will result in the recordation of a confidential conversation. [Citations.]" (*People v. Superior Court (Smith)* (1969) 70 Cal.2d 123, 134 [74 Cal.Rptr. 294, 449 P.2d 230] *(Smith)*.)

*Smith*'s definition describes general criminal intent: " 'As Professor Perkins puts it: "Intent includes those consequences which (a) represent the very purpose for which an act is done (regardless of the likelihood of occurrence), or (b) are known to be substantially certain to result (regardless of desire)." ' " (*People v. Colantuono* (1994) 7 Cal.4th 206, 217 [26 Cal.Rptr.2d 908, 865 P.2d 704].) ■ Respondents contend that even if the definition of intent applied by *Smith* to criminal eavesdropping were appropriate in a civil action arising under Penal Code section 632, it has no place in an action based upon the common law intrusion tort. We disagree.[3]

---

[3] And we note that since trial of this action, civil jury instructions have been rewritten, and an instruction now provides a dual definition of intent for general use in intentional torts. It states: "[Name of defendant] acted intentionally if [he/she] intended to [insert facts, e.g., 'assault [name of plaintiff],' 'commit a battery'] or if [he/she] was substantially certain that the

*Smith*'s dual definition of intentional is in essence, the definition found in the Restatement Second of Torts: "The word 'intent' is used throughout the Restatement . . . to denote that the actor desires to cause consequences of his act, *or* that he believes that the consequences are substantially certain to result from it." (Rest.2d Torts, § 8A, italics added.) Thus, "[i]ntent is not . . . limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." (Rest.2d Torts, § 8A, com. b.)[4]

The dual definition is used widely in civil actions. (E.g., *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1156–1157 [131 Cal.Rptr.2d 29, 63 P.3d 937] [intentional interference with prospective economic advantage]; *Akins v. State of California* (1998) 61 Cal.App.4th 1, 36 [71 Cal.Rptr.2d 314] [inverse condemnation, intentional diversion of waters]; *Arendell v. Auto Parts Club, Inc.* (1994) 29 Cal.App.4th 1261, 1265 [35 Cal.Rptr.2d 83] [intentional employer misconduct]; *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 744–745 [15 Cal.Rptr.2d 815] [insurance policy exclusion for intentional torts].)

In spite of its widespread use, there was no separate BAJI instruction at the time of this trial for the dual definition of intent for general use in tort actions or for use in privacy actions, although the dual formula was used in defining several specific torts. (See, e.g., BAJI Nos. 7.81, 7.83, 12.77.) The trial court did not, however, borrow from other intentional torts. Nor did the court use either the Restatement language or the language suggested in *Smith, supra,* 70 Cal.2d at page 132.[5]

Over appellants' objection, the trial court engrafted respondents' instruction, *and more,* onto BAJI No. 7.20, which sets forth the elements of an invasion of privacy cause of action.

[insert facts, e.g., 'assault,' 'battery'] would result from [his/her] conduct." (CACI No. 1320 (2003–2004).)

[4] Tentative Draft No. 1 of the Restatement (Third) of Torts separately sets out each part of the dual definition: "A person acts with the intent to produce a consequence if: [¶] (a) The person has the purpose of producing that consequence; or [¶] (b) The person knows to a substantial certainty that the consequence will ensue from the person's conduct."

[5] Later, appellants, after some discussion with the court, proposed the following: "A person who acts in conscious disregard for whether his or her actions could cause harm is said to be acting with intent." Appellants do not claim on appeal that their proposed instruction should have been given. Indeed, we know of no context where such a "conscious disregard" might be relevant to intent, other than to define *implied malice* in a murder case (see, e.g., *People v. Martinez* (2003) 31 Cal.4th 673, 684, 687 [3 Cal.Rptr.3d 648]), or as *part* of the definitions of malice and oppression for purposes of punitive damages. (See, Civ. Code, § 3294, subd. (c).)

Unmodified, BAJI No. 7.20 (9th ed.) reads: "The plaintiff _____ [also] seeks to recover damages based upon a claim of invasion of privacy by intrusion into private affairs. [¶] The essential elements of this claim are: [¶] 1. The defendant intentionally intruded, physically or otherwise, upon the solitude or seclusion, private affairs or concerns of the plaintiff; [¶] 2. The intrusion was substantial, and of a kind that would be highly offensive to an ordinarily reasonable person; and [¶] 3. The intrusion caused plaintiff to sustain injury, damage, loss or harm. [¶] In determining whether an intrusion is highly offensive, you should consider all of the evidence, including the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting in which the intrusion occurs, and the plaintiff's expectations of privacy in that setting."

At respondents' request, the court added the following language: "For liability the intrusion must have been intentional. *Any unintended or mistaken foray into the territory of another does not give rise to liability.* The intrusion must also have been injurious or damaging. [¶] *Any act committed or an omission made in ignorance or by reason of a mistake of fact disproves any intent to commit such act or omission. Thus, a person does not act unlawfully if he or she commits an act or admits the act under an actual belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful.*" (Italics added.)

Respondents took the phrase "unintended or mistaken foray into the territory of another" from *Miller v. National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1483 [232 Cal.Rptr. 668] (*Miller*). "The admonition has been frequently stated that it is dangerous to frame an instruction upon isolated extracts from the opinions of the court. [Citations.]" (*Francis v. City & County of San Francisco* (1955) 44 Cal.2d 335, 341 [282 P.2d 496].) "The discussion in an appellate decision is directed to the issue presented. The reviewing court generally does not contemplate a subsequent transmutation of its words into jury instructions and hence does not choose them with that end in mind. We therefore strongly caution that when evaluating special instructions, trial courts carefully consider whether such derivative application is consistent with their original usage." (*People v. Colantuono, supra,* 7 Cal.4th at p. 221, fn. 13.)

Respondents' instruction amply illustrates the problem. There was no issue in *Miller* of instructional error, since the matter was before the court on appeal from a summary judgment; and there was no issue with regard to the definition of *intentional*. (*Miller, supra,* 187 Cal.App.3d at p. 1470.) The issue presented was whether the plaintiff's complaint stated a cause of action, and the phrase, "unintended or mistaken foray," appears in a discussion of what conduct might be "highly offensive to a reasonable person." (*Id.* at

pp. 1482–1483.) No language in *Miller* provided an appropriate instruction on the definition of intent for use in this case.

■ Further, the trial court's explanation of mistake of fact had no place in the definition of intent. Mistake of fact provides a defense to numerous causes of action. One such example is as a defense to the enforcement of a contract. (See *Pechtel v. Universal Underwriters Ins. Co.* (1971) 15 Cal.App.3d 194, 205 [3 Cal.Rptr. 53].) It may also provide a defense to one charged with crime. (*People v. Mayer* (2003) 108 Cal.App.4th 403, 412 [133 Cal.Rptr.2d 454].) It may negate malice. (*Ebaugh v. Rabkin* (1972) 22 Cal.App.3d 891, 895 [99 Cal.Rptr. 706].) We have found no case in which mistake of fact was interposed as a defense in a privacy action, although the defense is suggested in *Smith*'s example of the person who intends to record the calls of wild birds on a game reserve, but accidentally picks up the confidential discussions of two poachers. (*Smith, supra,* 70 Cal.2d at p. 132.) Although *Smith* does not elaborate, the mistaken fact is, of course, that only birdsong is being recorded.

■ Thus, we have no difficulty concluding that mistake of fact can provide a defense to a privacy action. It remains, however, that mistake of fact is an *affirmative defense*. (See, e.g., *People v. Mayberry* (1975) 15 Cal.3d 143, 157 [125 Cal.Rptr. 745, 542 P.2d 1337]; *Mosher v. Mayacamas Corp.* (1989) 215 Cal.App.3d 1, 5 [263 Cal.Rptr. 373].) An affirmative defense is new matter that defendants are required to plead and prove. (See generally *Cahill Bros., Inc. v. Clementina Co.* (1962) 208 Cal.App.2d 367, 385 [25 Cal.Rptr. 301].) But respondents did not interpose an affirmative defense based upon mistake of fact; and further, as we shall explain, the evidence does not support such a defense.

" 'A mistake of fact is when a person understands the facts to be other than they are . . . .' [Citation.]" (*Berry v. Berry* (1956) 140 Cal.App.2d 50, 59 [294 P.2d 757].) The circumstances of the recording of the telephone call were described by Jeffrey Leemon, who was the QRZ soundman for "The Final Act" segment. He had fitted Officers Lawson and Jackson with lapel microphones, and along with QRZ cameraman, Ruben Scheinberg, accompanied the officers to Michael Marich's apartment. Leemon was also equipped with a boom microphone, wireless transmitters attached to the lapel microphones, and a belt mixer with headphones.

Leemon had been a soundman since at least 1990, and had worked on a number of news shows. He was familiar with the use of lapel microphones, or "lavaliere" microphones, and their capabilities. The "Tram" model lapel microphone he was using on that occasion can pick up the conversation of someone six feet away, or even the sound of a car outside. Officer Jackson's

microphone was attached approximately 5 inches below his chin, and the speaker portion of the telephone receiver was within 12 inches of the microphone.

When Officer Jackson started his conversation with appellants, Leemon was about seven feet away, and with his naked ears, he could hear some kind of sound coming out of the speaker of the telephone receiver. He put his headphones on, and through the headphones, he heard what sounded like the buzz of voices coming through the other side of the telephone line. It sounded like a human voice, and he knew it was live, not an answering machine, because Officer Jackson was speaking to someone. He could have turned the equipment off to stop the transmission, but he did not do so, assuming that if any of the other side of the conversation had been recorded, the editors would take care of it. In fact, he later told one of the video editors that he may have picked up the voices of the people on the other side of the telephone line.

Leemon testified that he did not intend to record both sides of the conversation, but that he knew that it was possible for his equipment to do so. Leemon also knew that he needed the consent of both parties to record a telephone conversation, but no one asked appellants whether they consented to having their voices recorded.

Thus, the only mistake of fact entertained by Leemon was with regard to what the editors might do *after* the telephone conversation was recorded. But eavesdropping or recording of conversations without consent is prohibited "regardless of whether the party expects that the *content of the conversation* may later be conveyed to a third party." (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 775 [117 Cal.Rptr.2d 574, 41 P.3d 575]; Pen. Code, § 632.) And Penal Code section 632 is violated the moment a confidential communication is recorded without consent, regardless of whether it is subsequently disclosed. (*Friddle v. Epstein* (1993) 16 Cal.App.4th 1649, 1660–1661 [21 Cal.Rptr.2d 85].) And the jury so found in the answers to special interrogatories 11 and 12.

Mistake of fact is not a defense to an unlawful act where the defendant's actions would still have been unlawful if the facts had been as he believed them to be. (See *People v. Watkins* (1992) 2 Cal.App.4th 589, 594 [3 Cal.Rptr.2d 563].) Mistake of fact, therefore, was not available as a defense under the facts of this case, and the trial court did not give the instruction as an explanation of respondents' affirmative defense. The court used it to define or explain the meaning of intentional. But as we have explained, the result was an incorrect definition or explanation of intentional, which was the focus of special interrogatory 13.

The erroneous mistake-of-fact instruction was inserted into the court's instruction with regard to the elements of appellants' cause of action. And the instruction came fairly soon after the trial court instructed the jury that appellants bore the burden of proving by a preponderance of the evidence all of the facts necessary to establish the essential elements of their claims.

It is, of course, the defendant who "has the burden of proof as to each fact the existence or nonexistence of which is essential to the . . . defense that he is asserting." (Evid. Code, § 500.) Thus, the trial court erroneously instructed the jury that appellants bore the burden to *disprove* mistake of fact, as an element of their cause of action.

Respondents claim that appellants agreed to the changes, and they contend that such acquiescence, combined with their failure to propose an appropriate alternative instruction, waived any error. Respondents rely upon the rule that "a jury instruction which is incomplete or too general must be accompanied by an objection or qualifying instruction to avoid the doctrine of waiver. [Citation.]" (*Bishop v. Hyundai Motor America* (1996) 44 Cal.App.4th 750, 760 [52 Cal.Rptr.2d 134].)

Appellants did, in fact, submit a proposed instruction prior to trial that quoted *Smith*'s dual definition, and respondents admitted at oral argument that the trial court tacitly refused the instruction, and that appellants did not withdraw it. Further, there was an objection of sorts. Appellants' counsel agreed to BAJI No. 7.20 only "as long as it was BAJI without the modifications and insertions."

Respondents contend that appellants later acquiesced in the erroneous instruction. They point to a discussion in which appellants' counsel objected again to the addition of language to BAJI No. 7.20, which the court overruled, prompting counsel to request a change in at least one of the words. The trial court agreed, and moved the instruction into the court's "agreed upon set." Appellants thus made their objection, and we find no acquiescence in their having refrained from arguing the point further with the court.

The second incident came at the end of trial, in a sidebar discussion during the instruction of the jury, in which the court suggested changing the words, "each defendant," to "a person" in BAJI No. 7.20, and the words, "the MGM defendants," to simply, "MGM." The court made the changes, and asked, "Is there [any] objection to the jury instructions?" Appellants' counsel said, "Yes, Your Honor—No." Thus, appellants were not acquiescing in the erroneous instruction, as respondents insist, but merely agreeing to minor changes.

Respondents also interpret another part of the same sidebar discussion as acquiescence. Defense counsel stated, "We preserve all of our objections that

we have previously stated on the record." The trial judge replied, "[I]f you want to preserve [all of your] objections, you really need to state them on the record." The court did not order the parties to renew all objections. And we see no need for them to have done so, since they had already placed their objection on the record.

The authorities upon which respondents rely are inapposite. In both *Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 857 [176 Cal.Rptr. 239], and *Brawthen v. H & R Block, Inc.* (1975) 52 Cal.App.3d 139, 148 [124 Cal.Rptr. 845], the appellants had expressly stated that they had no objection to a particular instruction. Here, respondents have shown only that appellants missed opportunities to object repeatedly, and failed to continue to argue the issue after the court had ruled. We find no waiver.

In any event, the rule of waiver upon which respondents rely applies only to a jury instruction which is incomplete or too general; it does not apply to an "instruction which is prejudicially *erroneous as given,* i.e., which is an incorrect statement of law." (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 [28 Cal.Rptr.2d 133].) ■ And the right to challenge an incorrect instruction on the burden of proof is not waived by a failure to suggest an alternative. (*Enis v. Specialty Auto Sales* (1978) 83 Cal.App.3d 928, 939–940 [148 Cal.Rptr. 255].)

Respondents also contend that no prejudice resulted from the error. Respondents assert that in spite of the testimony we have summarized, Leemon only "appeared" to testify that the buzz he heard sounded like voices, because he clarified on cross-examination by defense counsel that he merely *suspected* that the buzzing was the sound of voices. ■ Since the evidence must be viewed in a light most favorable to appellants, not respondents, for purposes of gauging the effect of an erroneous instruction, we decline to engage in respondents' semantic exercise. (See *Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 673–674 [117 Cal.Rptr. 1, 527 P.2d 353].)

■ Prejudice is shown where it is probable that the jury based its verdict on the issue that was the subject of the erroneous instruction. (See *Henderson v. Harnischfeger Corp., supra,* 12 Cal.3d at p. 670.) Other factors for measuring the prejudicial effect of an erroneous instruction are: "(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations]." (*LeMons v. Regents of University of*

*California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].) As we shall explain, *all* of the enumerated factors weigh in favor of prejudice in this case.

Despite Leemon's clarification of his belief on cross-examination, the evidence in this regard was not in conflict. There is little difference between believing that a certain noise is a human voice and suspecting that the noise is a human voice. And even under the facts as described by respondents, a jury correctly instructed with regard to the dual definition of intent, might reasonably find that because Leemon continued to record while he "suspected" that he heard voices on the other end of the telephone line, knowing that his equipment was capable of picking them up, he knew "to a substantial certainty that his use of the equipment [would] result in the recordation of a confidential conversation." (*Smith, supra,* 70 Cal.2d at p. 134.)

The jury's confusion over the court's definition of intentional was manifest, especially given its affirmative responses to special interrogatories 11 and 12. On July 25, 2001, the first full day of deliberations, the jury requested a legal definition of the word *intent.* The following day, the foreperson informed the court that the jury might be deadlocked. After further deliberations, the jury asked, "Does an intentional action always require that it be planned?" It also asked, "Can a person intentionally do something halfway through a specific action or does intention require that it happen at the beginning of a specific action?"[6]

On July 27, 2001, the jury asked for further argument from counsel on "the issue of 'intentional intrusion,' and how *they* believe any QRZ employee might or might not have intentionally intruded."

The trial court allowed additional argument, but the absence of an appropriate instruction defining intent gave respondents the opportunity to define it *incorrectly* to their advantage. Defense counsel gave the jury his *own* dual definition of intentional. He argued, "There's two different ways you can look at what Jeffrey Leemon intended to do. One way you could look at it is what did he want to do? What was his purpose? What was his desire? Another way you could try to look at it in your common sense way is what was he *certain* was happening as a consequence of his actions." (Italics added.) After arguing that it was not Leemon's purpose or desire to record appellants' side of the conversation, counsel said, "Now, second [*sic*] way you could look at this would be to say did he know it was being recorded? Was he *certain* that noise, that buzz on the other side was being recorded? Well, the answer is no, he wasn't." (Italics added.)

---

[6] The court gave a simple no to the first question and the second part of the second question, and answered the first part of the second question, "yes, so long as the intent is formed while the act is being done, the conduct thereafter is intentional."

Thus, the jury received something akin to the Restatement's dual definition of intent from defense counsel. But under that version, intent is not a belief that the consequences are substantially certain to result, as set forth in the Restatement Second of Torts, section 8A, or even a substantial certainty that the consequences would result (as juries will now be instructed by CACI No. 1320), but knowledge that the consequences are *certain* to result. Since it is unlikely that a jury would find that Leemon entertained an unqualified degree of certainty, even though the evidence was compelling that he knew that it was *substantially* certain that appellants' voices had been picked up by the equipment during videotaping, it is probable that counsel's argument misled the jury.

Defense counsel's additional argument also emphasized the erroneous mistake instruction. Counsel argued, "If there were other sounds picked up, and you could barely hear them on the tape he had, it was by mistake. It was inadvertent. And the judge instructed you that if it's not intentional, if it was done by mistake or inadvertently, you must find no liability on that question. He's instructed you on that." We find it probable that this argument also contributed to the instruction's misleading effect.

The jury's verdict was close. Indeed, it was deadlocked eight-to-four over the very issue of intent, until the parties agreed to an eight-to-four verdict.

No other instructions clarified or corrected the erroneous definition of intent or the erroneous shifting of the burden of proof. When appellants requested an additional instruction, the trial judge said to counsel, "Intentional conduct means you know what you are doing and you know what is happening. You are aware or cognizant of what is going to happen when you do something. Doesn't mean you wanted it to happen. It doesn't mean you have a bad purpose. That's what intent means. I've said that repeatedly." In fact, the trial court had not said it at all.[7] When the jury asked for a definition of intent, the court simply replied, "The term 'intent' has a common sense, generally understood meaning," and referred the jury to the instructions that are now at issue.

The jury did not find that respondents entertained the requisite intent, but it did find that they recorded or eavesdropped upon appellants' side of a confidential communication without their consent. We conclude that whether the facts are viewed as we have described them or as respondents have

---

[7] During deliberations, appellants proffered a third instruction, this time based on the second part of the Restatement's dual definition, but it was an argumentative instruction, and it unfortunately used the pedantic shorthand, "oblique intention," to describe that second part. (See *People v. Smith* (1997) 57 Cal.App.4th 1470, 1485 [67 Cal.Rptr.2d 604].) It is doubtful that any juror would have understood the concept, even if he or she understood the words.

described them, it is probable that a correctly instructed jury would have found that Leemon knew that recording or eavesdropping was substantially certain to result from the use of QRZ's equipment, and that his conduct was therefore intentional. (See *Smith, supra,* 70 Cal.2d at p. 132; Rest.2d Torts, § 8A.)

Although we reverse the judgment due to this instructional error, we shall discuss appellants' other contentions to the extent that they might be at issue upon retrial.[8]

### 2. *Sound Enhancement as Separate Intrusion*

Appellants contend that the editing process of the videotape to enhance the sound of their voices constituted a separate intrusion into their privacy, for purposes of both the common law tort and a violation of Penal Code section 632, and they contend that the trial court erred in ruling that it was not. They also request that we direct a verdict in their favor on this cause of action.

The evidence supporting appellants' contentions was the testimony of Sabrina Buchanek, the sound editor for *LAPD: Life on the Beat.* Buchanek testified that when she listened to the tape, she heard sounds on the other end of the telephone responding to Officer Jackson, but there were no discernible words. She informed the executive producer of the show that there was a phone call in the segment, but he made no response.

Buchanek used a digital audio work station to edit the sound on the segment. The program on the workstation permits equalization, pitch shifting, reverse sound, and time compression and expansion. She conceded that her equipment was probably responsible for making appellants' sounds more audible, but she denied that they were louder or softer in relation to other sounds on the tape. Buchanek testified that she has the capability of lowering surrounding sounds to make soft sounds louder, and admitted in deposition that she did so in this case, although she testified at trial that she did not think she did.

We have difficulty discerning just what ruling appellants claim to be erroneous. Appellants contend that Buchanek's actions were an additional actionable intrusion, but admit that they are not set forth in the complaint, and they do not claim to have sought leave to amend to conform to proof.

---

[8] Thus, we need not reach appellants' claim that they were coerced into agreeing to accept an eight-to-four verdict by the trial court's proposed "Allen charge." (See fn. 2, *ante.*) We observe, however, that appellants admit in their reply brief that the court did not link the proposed charge to the eight-to-four stipulation, and appellants do not refer to any part of the record to support their claim that they entered into stipulation in order to avoid the charge.

Further, appellants do not claim to have submitted jury instructions or a special verdict form regarding such a cause of action.

Appellants refer to a discussion prior to jury selection in which respondents' counsel asserted that Buchanek's enhancement of the sound would not be actionable. Our review of the discussion reveals that it was a hearing on motions in limine, although it is not clear from the record to which motion in limine the particular discussion related, that respondents' assertions were made with regard to evidence of the sound enhancement, and that the resulting ruling was that the evidence was admissible.

During the discussion, the court made the comment that the sound enhancement was not a separate tort, but relevant to the issue of respondents' intent, and that the "tort is completed when the intrusion occurs." ▮ Comments made by the trial court are not rulings to be reviewed on appeal. (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1451 [125 Cal.Rptr.2d 277].) Thus, the only order to come from the cited discussion was a ruling that evidence was admissible, and since that ruling appears to have been in appellants' favor, they may not challenge it on appeal. (*Nevada County Office of Education v. Riles* (1983) 149 Cal.App.3d 767, 779 [197 Cal.Rptr. 152]; Code Civ. Proc., § 902.)

Our own review of the record also reveals that prior to playing the videotape (exhibit No. 179) for the jury, the trial court instructed: "Any editing or other actions to prepare a recording to be broadcast is not an unlawful intrusion or an unlawful eavesdropping or recording of a confidential communication." As we shall explain, the instruction was correct.

Respondents' liability for Buchanek's conduct, if any, rests on her status as a QRZ employee, on the theory that Buchanek's actions are those of respondents. Thus, appellants' theory of a separate intrusion is the equivalent of imposing punishment upon the original eavesdropper every time that original eavesdropper listens to the illegal recording. Penal Code section 632, however, prohibits only a " 'real time' interception of a communication." (*People v. Drennan* (2000) 84 Cal.App.4th 1349, 1356 [101 Cal.Rptr.2d 584].)

With regard to the common law intrusion tort, Buchanek's actions, whether it is listening to the tape or enhancing its sounds, will be separately actionable only if they separately constitute an "(1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 914 [85 Cal.Rptr.2d 909, 978 P.2d 67] (*Saunders*).)

The first element is missing unless Buchanek " 'penetrated some zone of physical or sensory privacy surrounding [appellants], or obtained unwanted

access to data about [appellants].' " (*Saunders, supra,* 20 Cal.4th at pp. 914–915.) Of course, she was in her studio, not within a zone of privacy surrounding appellants, and it was not Buchanek who obtained the recording. But let us assume for the moment that receiving a copy of the recording satisfies the first element. The question becomes one of whether she did so "in a manner highly offensive to a reasonable person."

It was appropriate for the trial court to determine this question. "There is a preliminary determination of 'offensiveness' which must be made by the court in discerning the existence of a cause of action for intrusion. [Citations.]" (*Sanchez-Scott v. Alza Pharmaceuticals* (2001) 86 Cal.App.4th 365, 376 [103 Cal.Rptr.2d 410]; *Wilkins v. National Broadcasting Co.* (1999) 71 Cal.App.4th 1066, 1075–1076 [84 Cal.Rptr.2d 329]; *Miller, supra,* 187 Cal.App.3d at pp. 1483–1484.)

Enhancing the sounds of appellants' voices may or may not be highly offensive, but it was not the manner in which Buchanek, and therefore her employer, obtained the recording. Arguably, respondents' had already obtained the private data about appellants in a highly offensive manner. ▮ What a defendant does with a surreptitious recording after obtaining it may affect the measure of damages (see *Miller, supra,* 187 Cal.App.3d at pp. 1480–1481, 1485), but it is not a new "obtaining." Buchanek's conduct, therefore, satisfies neither element of the tort, and the trial court did not err.

### 3. *Damages Caused by the Broadcast*

Appellants contend that they were entitled to recover damages caused by the broadcast of the videotape. Once again, appellants fail to identify what ruling that they are challenging. Instead, they direct their argument to a contention that they claim *respondent* made, that damages are fixed at the moment of the recording, but they do not refer to any part of the appellate record where respondents may have made such a contention; and they fail to explain the context in which the contention may have been made. But respondents engaged appellants' contention by filing a letter dated November 4, 2003, citing our case of *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156 [1 Cal.Rptr.3d 536] for this proposition. It is thus apparent that respondents confirm that they do make such a contention. ▮ *Lieberman* does not stand for the proposition that damages may not be recovered for a subsequent publication of an unlawfully obtained recording. The law is to the contrary. As a general proposition, a plaintiff may recover for his or her personal injuries, such as emotional distress, caused by seeing a broadcast of an illegal recording. (See *Lieberman v. KCOP Television, Inc., supra,* 110

Cal.App.4th at p. 167 [under Pen. Code, § 632]; *Miller, supra,* 187 Cal.App.3d at pp. 1480–1481, 1485 [film obtained by trespass].)

### 4. *Directed Verdict on Appeal*

Appellants' final point is a request that we direct the trial court to enter judgment in their favor on the issue of intent. Appellants cite no authority for this request in their opening brief. In their reply brief, they refer to the power of the appellate court to order the entry of the proper judgment. (Code Civ. Proc., § 43; see, e.g., *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1220 [11 Cal.Rptr.2d 918]; *County of Butte v. Bach* (1985) 172 Cal.App.3d 848, 870–871 [218 Cal.Rptr. 613].) Appellants have not provided authority giving us the power to direct the entry of a single factual finding, and we decline the request.

## DISPOSITION

The judgment is reversed. Appellants shall have their costs on appeal.

Vogel (C.S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied December 16, 2003.