Filed 4/26/16  Bellflower Unified School Dist. v. Comm. On Prof. Competence CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BELLFLOWER UNIFIED SCHOOL DISTRICT, <br><br>     Plaintiff and Appellant, <br><br>     v. <br><br> COMMISSION ON PROFESSIONAL COMPETENCE, <br><br>     Defendant and Respondent; <br><br> PAMELA McMACKIN, <br><br>     Real Party in Interest and Respondent. | B262523 <br><br> (Los Angeles County <br> Super. Ct. No. BS146618) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joanne O'Donnell, Judge.  Affirmed.

Law Offices of Eric Bathen, Eric J. Bathen and Jordan C. Meyer for Plaintiff and Appellant.

Hathaway, Perrett, Webster, Powers, Chrisman & Gutierrez and Robert A. Bartosh for Real Party in Interest and Respondent, Pam McMackin.

## INTRODUCTION

Bellflower Unified School District appeals from the judgment of the trial court denying its petition for writ of mandate to set aside the decision of the Commission on Professional Competence which reinstated teacher and administrator Pamela McMackin. McMackin was the program administrator of the Bellflower Alternative Education Center, a school serving students who had been expelled or removed from the mainstream classroom setting. The district attempted to dismiss McMackin following an incident involving the sale of marijuana at the center. The commission found McMackin displayed extremely poor judgment during and after the incident, but reversed the district's decision to dismiss McMackin, mainly because the incident was isolated, McMackin realized the gravity of her misconduct shortly after the incident and cooperated with the district's investigation, and she testified credibly she would not repeat her mistake in the future. The commission also noted McMackin performed her job well for many years, and in a particularly demanding educational setting. Bearing in mind the limited scope of our review in these proceedings, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### A.    McMackin's Employment With the District

McMackin earned her teaching credential in 1980. Throughout her professional career, she worked in the area of alternative education, assisting both adults and students in grades K-12 who had been unsuccessful in a traditional classroom setting. McMackin joined the district in 2006, working as a program administrator at Somerset High School, a continuation school.

In March 2012, McMackin became the program administrator at the Bellflower Alternative Education Center. The center is small, generally serving between 20 and 35 students in grades 6 through 12. Students at the center typically fall into two categories: those who have been expelled from the mainstream school setting, and those who have been transferred to the center for disciplinary reasons. McMackin described these students as "often angry, defiant, and not successful in the regular K-12 setting." The center is the final option for district students who have been expelled; although the

2

students may be required to perform community service hours or receive counseling if their issues do not resolve, the students generally cannot be expelled from the center. Students who remain at the center, rather than returning to their home school, rarely complete high school successfully. McMackin knew of only two or three students at the center who graduated during the six years she worked at Somerset.

As the center's program administrator, McMackin generally spent 80 to 90 percent of her day handling student discipline issues. Boys in the 12-to 15-year-old age range generally presented the most challenging discipline issues, as they tended to be the most defiant and disrespectful, and freely used curse words in their interactions with the teachers. At the insistence of the teachers, students were searched on their way in to the center in the morning, and were also subject to random searches while on campus. The center had one security guard who was on campus for 15 minutes in the morning and 30 minutes at lunch.

After McMackin became the center's administrator, she began making significant changes to the program in an effort to set higher expectations for the students. For example, she began developing project-based lessons, which she hoped would increase student interest, focus and success. McMackin also did away with the teachers' prior common practice of showing movies (including R-rated movies) during the afternoon school sessions. McMackin hoped by emphasizing and improving the quality of education at the center, students would be more engaged in the program and discipline would improve as a result.

### B. The Marijuana Sale

The drug sale at issue in this proceeding involved two students, J.C.G. and J.T.[1] McMackin met J.C.G. when he started attending the center in July 2012. McMackin described J.C.G. as "smart" and "bright," but said he had discipline problems at the center. Every teacher at the center had, at some point, sent him out of class because he

---

[1] Because the students are minors and their identities are confidential, they are identified in the administrative record only as "J.T." and "J.C.G."

3

was disrespectful, defiant, or told the teacher to "F off." McMackin suspended J.C.G. at least nine times between his arrival at the center and the incident on October 4, 2012. McMackin tried to improve J.C.G.'s situation by consulting other administrators in the district and trying different discipline approaches with him. She spoke frequently with both J.C.G. and his parents, who were very upset by his behavior. However, her efforts did not yield results and McMackin became increasingly frustrated with J.C.G. Although McMackin did not think J.C.G. was part of a gang, she suspected he was involved in some way in the on-campus drug presence.

McMakin had more success with J.T., who transferred to the center after getting in a fight at her previous school. J.T. was in the special education class at the center, which was taught by Ricardo Carlos. Because J.T. struggled with emotional problems and was prone to tantrums, her teachers often sent her to McMackin's office, where McMackin allowed her to help with small tasks such as stapling papers. McMackin felt she developed a good rapport with J.T. during those frequent visits.

The marijuana sale took place on October 4, 2012, roughly six months after McMackin took over as administrator of the center. That morning, Carlos came to McMackin's office and said he learned about a possible drug deal between J.T. and another student. J.T., who was waiting in the hall outside McMackin's office, came in and told McMackin she planned to buy drugs from J.C.G. during the lunch break. Apparently, J.T. was irritated with J.C.G. because he tried to sell her "bad drugs" (marijuana laced with an unknown substance) on a prior occasion. McMackin was already aware of the presence of drugs at the center and wanted to get drugs off the campus. McMackin approved the sale and suggested J.T. use a pen to mark the bill she would use to purchase the marijuana.

Carlos, who was present during this exchange, counseled against McMackin's plan. He proposed they search J.C.G. instead, presumably in the hopes of discovering the marijuana. McMackin authorized Carlos to search J.C.G. at a later time but did not call off the sale. Carlos and J.T. returned to their classroom.

4

Coincidentally, another teacher, Nico Turien, brought J.C.G. to McMackin's office later that morning after J.C.G. burst into Turien's classroom and threatened another student. When J.C.G. arrived at McMackin's office, he was visibly upset and had to be restrained by Turien. Turien searched J.C.G. and found him in possession of $29, but found no marijuana. After J.C.G. calmed down, McMackin sent him back to class.

When the student lunch break began, McMackin went outside to the student lunch area. She watched the drug deal between J.T. and J.C.G. as it took place, but did not approach the students during or immediately after the exchange because she feared J.C.G. would cause a disruption or leave the campus. Shortly thereafter, J.T. met McMackin at her office and gave her the bag of marijuana she purchased from J.C.G. After J.T. left, McMackin asked the school's security guard to bring J.C.G. to her office. At McMackin's request, the guard searched J.C.G. and found $29 in his wallet and a crumpled five-dollar bill in his pocket. The five-dollar bill had scribbled pen markings on it. J.C.G. initially denied selling marijuana to J.T., but admitted to the sale after McMackin showed him the bag of marijuana and told J.C.G. she saw him sell it to J.T. When McMackin threatened to call the police, J.C.G. begged her not to do so. J.C.G promised he would improve his behavior and McMackin believed him because he appeared to be "broken down." McMackin did not call the police or report the incident to anyone at the center at that time.

After the school day ended, McMackin left the campus to go to the post office. As she thought about what had transpired, she began to feel uncomfortable with her decision regarding the marijuana sale and eventually "realized [she] had made mistakes." McMackin returned to campus and met with her direct supervisor, Joe Perry, about the sale. When she met with Perry, McMackin was upset, but described the incident candidly and took responsibility for her actions. After discussing the incident with McMackin and several other administrators, Perry asked McMackin to return to her office and prepare a written statement concerning the events of the day. McMackin explained she had worked extremely hard to make improvements at the center, but had

5

become increasingly frustrated with student discipline problems. She fully acknowledged she made a "terrible mistake" and a "terrible error in judgment."

After McMackin completed her statement, Perry placed her on administrative leave.

### C. The District's Notice of Suspension and Intention to Dismiss

On November 16, 2012, the district notified McMackin in writing of her suspension and the district's intention to dismiss her. McMackin requested a hearing. The district then filed an accusation setting out the reasons the district sought McMackin's dismissal. The district identified several statutory grounds for termination under Education Code[2] section 44932, subdivision (a): "immoral or unprofessional conduct," "evident unfitness for service," and "persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools by the State Board of Education or by the governing board of the school district employing him or her." The district also alleged grounds to terminate McMackin under section 44939 for "[w]illful refusal to perform regular assignments without reasonable cause, as prescribed by the rules and regulations of the employing school district."

### D. The Hearing and the Commission's Decision

McMackin requested a hearing before the Commission on Professional Competence. At the hearing, which took place over two days in May 2013, McMackin acknowledged her conduct on October 4, 2012, was wrong. McMackin was contrite, and said she had learned from the experience and would handle a similar situation differently in the future. McMackin also explained that October 4, 2012, was a particularly hectic day. At that time, McMackin was aware students were bringing drugs on campus and she was focused on ways to get drugs off the campus. She professed that, at the time she spoke with J.T., she was not thinking of the five-dollar marijuana sale as a crime, but rather as a means to curtail drug activity on campus.

---

[2] All further undesignated statutory references are to the Education Code.

6

However, McMackin denied she was making an excuse for her misconduct: "I'm raising an excuse for why I didn't have time to think it through. Once I had time to think it through, I had no excuse." McMackin also claimed she was unaware she was required to report the on-campus drug sale to police.

The commission issued its initial opinion on December 2, 2013, and its amended decision on April 8, 2014. The commission found McMackin's conduct—specifically, failing to stop the drug sale—was "immoral" conduct within the meaning of section 44932, subdivision (a)(1). But although the commission found statutory grounds for termination existed, two of the three members of the commission concluded "her conduct did not demonstrate 'such unfitness to teach as to warrant terminating the teacher's employment.' [Citation.]" The commission reversed the district's decision to dismiss McMackin and ordered the district to reinstate her and compensate her for lost wages and benefits. One member of the commission dissented in part, stating she agreed with the commission's factual findings but would have upheld the dismissal.

### E.     The District's Petition for Writ of Administrative Mandamus

The district filed a petition for writ of mandate in the Los Angeles County Superior Court. The district challenged the commission's decision to reinstate McMackin despite finding McMackin unfit to teach, arguing mainly that McMackin's misconduct was so egregious that her termination was required. The trial court denied the petition, finding the weight of the evidence supported the commission's findings. The court further found the commission did not abuse its discretion by reinstating McMackin, inasmuch as the commission perceived McMackin to be credible, honest and contrite, and on that basis reasonably concluded McMackin was unlikely to repeat her misconduct in the future. The court entered judgment in McMackin's favor, denying the petition and awarding McMackin costs and attorney's fees. The district timely appeals.

## DISCUSSION

### A.     Legal Framework

" 'A permanent employee, such as a certificated tenured teacher, has a vested right to [his] position and may not be deprived of it without due process of law. [Citation.]' [Citation.] The Education Code prescribes the 'procedures' to be followed when a school district wishes to dismiss, suspend or otherwise discipline a tenured teacher. [Citations.] Section 44932 lists the causes for dismissal. [Citation.]" (*DeYoung v. Commission on Professional Competence Etc.* (2014) 228 Cal.App.4th 568, 574, first alteration and omission in the original.) As is pertinent here, an employee may be dismissed for cause due to "immoral" or "unprofessional" conduct, "evident unfitness for service," or "persistent violation of or refusal to obey the school laws of the state or reasonable regulations prescribed for the government of the public schools by the state board or by the governing board of the school district employing him or her." (§ 44932, subd. (a)(1), (2), (6) & (8).)[3]

A finding of statutory grounds for dismissal is not sufficient standing alone to permit the dismissal of a teacher. In *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 (*Morrison*), our Supreme Court concluded that section 44932 was vague and potentially overbroad in permitting a teacher's dismissal for immoral or unprofessional conduct because those terms were not connected to the requirements of the teaching profession. (*Id.* at pp. 228-230.) The court held that a certificated teacher cannot be dismissed unless the immoral or unprofessional behavior showed that the teacher is "unfit to teach." (*Id.* at p. 229.) Accordingly, to dismiss a teacher on these grounds, there must be findings of immoral or unprofessional conduct, together with an additional finding that the misconduct renders the teacher "unfit to teach." The

---

[3]     Subdivision (a) of section 44932 was amended effective January 1, 2016, so that "immoral" conduct and "unprofessional" conduct each have their own enumerated subsection. (See § 44932, subd. (a)(1) & (2).) Although the enumeration of the remaining subsections changed as a result, the statute is identical in all other respects to the version in force at the time of McMackin's misconduct.

8

determination of "unfitness to teach" requires consideration of "(1) the likelihood that the conduct would recur; (2) the existence of aggravating or extenuating circumstances; (3) the impact of publicity; (4) the effect on teacher-student relationships; (5) any disruption of the educational process; (6) the employee's motive for the conduct; and (7) the proximity or remoteness in time of the conduct." (*Fontana Unified School Dist. v. Burman* (1988) 45 Cal.3d 208, 220 (*Fontana*), restating *Morrison, supra,* 1 Cal.3d at p. 229.)

An employee receiving notice of the school district's intention to suspend or dismiss her is entitled to an evidentiary hearing before the Commission on Professional Competence. (§§ 44934, 44944, subd. (a).) The commission's role is to determine whether the charged conduct occurred and "whether that conduct—measured against the *Morrison* criteria [citation]—demonstrates unfitness to teach . . . ." (*Fontana, supra,* 45 Cal.3d at p. 220.) The commission's decision to suspend or dismiss the employee (or not to do so) constitutes the final administrative decision. (§ 44944, subds. (c)(1), (d)(4).)

### B.    Standard of Review

Either party may obtain judicial review of the commission's decision by filing a petition for writ of mandate in the trial court. (§ 44945.) The trial court must exercise its independent judgment on the evidence in the record and determine whether the weight of the evidence supports the commission's decision. (*Ibid.*; Code Civ. Proc., § 1094.5, subd. (c).) However, because the commission has experience and expertise in evaluating teachers' performance, its findings are entitled to a strong presumption of correctness even under an independent judgment review. (See *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).)

"Where a superior court is required to make such an independent judgment upon the record of an administrative proceeding, the scope of review on appeal is limited. An appellate court must sustain the superior court's findings if substantial evidence supports them. [Citations.] In reviewing the evidence, an appellate court must resolve all conflicts in favor of the party prevailing in the superior court and must give that

party the benefit of every reasonable inference in support of the judgment. When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court. [Citation.]" (*Pasadena Unified Sch. Dist. v. Commission on Professional Competence* (1977) 20 Cal.3d 309, 314; see *DeYoung, supra*, 228 Cal.App.4th at p. 574.) " 'In other words, rarely, if ever, will a board determination be disturbed unless the petitioner is able to show a jurisdictional excess, a serious error of law, or an abuse of discretion on the facts.' " (*Fukuda, supra,* at p. 814.)

### C.     The Trial Court's Application of the Standard of Review

The district first contends the trial court applied the incorrect standard of review. We disagree.

According to the district, although the court's written decision states it performed an independent review, the court's "analysis reveals that it is essentially applying a 'substantial evidence' standard of review to the Commission's decision, which is a level of deference not afforded at the Superior Court's level of review." More particularly, the district notes the trial court's analysis focuses on the same evidence relied upon by the commission and on that basis the district infers the court did not review the evidence *in full* and did not *independently* evaluate the evidence. In support of its argument, the district cites *San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120 (*San Diego Unified*). However, if the case has any relevance here, it counsels us to affirm the court's decision.

In that case, a school district attempted to terminate a teacher due to allegations that he inappropriately touched one of his students. (*San Diego Unified, supra,* at p. 1126.) During proceedings before the commission, both the victim and her mother testified. (*Id*. at pp. 1126-1130.) The commission also reviewed the testimony they provided in two prior criminal proceedings against the teacher and found a number of inconsistencies which reflected negatively on their credibility. (*Id*. at pp. 1130-1132, 1137-1138.) Based largely on that credibility finding, as well as other conflicts in the evidence, the commission found no substantial evidence to support the district's

dismissal. Considering the district's petition for writ of administrative mandamus, the trial court issued a cursory opinion which failed to discuss the conflicting evidence analyzed by the commission and rejected the commission's credibility finding based on the court's own prior experience with juvenile matters. (*Id.* at pp. 1139-1140.) Although the Court of Appeal ultimately reversed the decision of the trial court, it did not do so because the trial court failed to apply the correct standard of review, as the district suggests. Rather, the court held the trial court erred by failing to give appropriate weight to the commission's credibility determinations and by failing to consider all the evidence in the administrative record. (*Id*. at pp. 1146-1149.)

The district's proffered authority is readily distinguishable. This is not a case in which the trial court rejected a commission's decision and substituted its own judgment based upon a selective, partial review of the underlying evidence. Rather, this is a case with a very limited set of undisputed facts, which did not require the trial court to resolve conflicts in the evidence. Further, the court here properly deferred to the commission's assessment of McMackin's credibility, unlike the court in *San Diego Unified*. In any event, the fact the written decisions of the commission and the trial court rely upon the same evidence in this case simply reflects the small universe of relevant facts; it is not symptomatic of any error by the trial court.

Although the district repeatedly argues the trial court erred, it fails to support its argument with any facts or reasonable inferences drawn from the evidence before us. The district does not, for example, direct our attention to any relevant evidence it contends the trial court should have, but did not, consider. Nor could it because, as noted, the essential facts here were undisputed. The district fails to demonstrate any error on the part of the trial court in this regard. (See, e.g., *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown' "].)

*San Diego Unified* is useful on another point, however. The court emphasized "[i]ndependent judgment review ' "does not mean that the preliminary work performed

11

by the administrative board in sifting the evidence and in making its findings is wasted effort. . . . [I]n weighing the evidence the courts can and should be assisted by the findings of the board." ' [Citation.]" (*San Diego Unified, supra,* 214 Cal.App.4th at p. 1141.) The court also criticized the trial court's rejection of the commission's decision and its credibility findings, particularly given the cursory analysis provided by the trial court: "We recognize that the trial court is entitled to substitute its own credibility determinations [citations], but it cannot ignore its statutory obligation to defer to the Commission's considered credibility findings in doing so. In our view, the superior court's decision—which is silent as to the Commission's thoughtful reasoning and analysis as to the witnesses' credibility—did not afford the respect due those findings." (*Id.* at p. 1148.) Accordingly, to the extent the district suggests the trial court should have ignored the findings of the commission here, particularly with respect to the credibility of McMackin, we reject the district's argument.

### D.     Statutory Grounds for Dismissal

As noted above, the commission found statutory grounds for termination based on McMackin's immoral conduct within the meaning of section 44932, subdivision (a)(1). Specifically, the commission stated McMackin's "failure to stop the drug sale to J.T. is conduct hostile to the welfare of the general public and contrary to good morals." The commission evaluated the evidence using the *Morrison* factors and agreed with the district that McMackin was unfit to teach. Based upon its independent review of the evidence, the trial court concluded the weight of the evidence supported the commission's findings.

On appeal, the district devotes a substantial portion of its briefing to the application of the *Morrison* factors in this case, even though the commission and the trial court accepted the district's contention that McMackin was unfit to teach. Because the district does not argue the commission or the court *erred* by finding McMackin unfit to teach, the *Morrison* factors present no issue for our consideration. (See, e.g., *Marich v. MGM/UA Telecommunications, Inc.* (2003) 113 Cal.App.4th 415, 431 [party cannot challenge favorable evidentiary ruling on appeal]; Eisenberg, et al., California Practice

12

Guide: Civil Appeals and Writs, § 8.198, p. 8-156 (2015).) Moreover, McMackin—the only party prejudiced by the finding of unfitness to teach—does not challenge that predicate factual finding in this appeal.[4] Accordingly, we need not, and therefore do not, analyze the evidence in this case in relation to the *Morrison* factors.

The district also argues the trial court and the commission erred by failing to find *additional* statutory grounds for termination existed. Specifically, the district complains McMackin's actions constituted not only "immoral" conduct, but also "evident unfitness for service" within the meaning of section 44932, subdivision (a). We decline to consider this issue because the existence of additional statutory grounds for termination would not affect the outcome of our decision. (See Civ. Code, § 3532 ["The law neither does nor requires idle acts"]; *Garibaldi v. Daly City* (1943) 61 Cal.App.2d 514, 517 ["An appellate court will not determine a question which will have no effect upon the status of the parties"]; *Kaiser Foundation Health Plan, Inc. v. Superior Court* (2012) 203 Cal.App.4th 696, 715-716 [same].) The question at the heart of this appeal is whether the commission abused its discretion by ordering McMackin's reinstatement despite the existence of statutory grounds for her termination. Whether McMackin's conduct constitutes one or multiple statutory grounds for termination does not change our analysis on that issue, nor would it have changed the commission's ultimate conclusion that termination was not warranted in this case.

### E. The Commission's Decision to Reinstate McMackin

Although the commission found McMackin unfit to teach, it reversed the governing board's decision to terminate her employment and ordered the district to reinstate her. The selection of a particular penalty by an administrative agency generally is reviewed under the abuse of discretion standard even where the superior

---

[4] McMackin did not appeal (or cross-appeal) from the judgment and has therefore waived the right to challenge the trial court's finding that the weight of the evidence supports the commission's conclusion that she is unfit to teach. (See *Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439 [noting that "a respondent who has not appealed from the judgment may not urge error on appeal"].)

court reviews the evidence under the independent judgment standard. (*West Valley-Mission Community College Dist. v. Concepcion* (1993) 16 Cal.App.4th 1766, 1779.)

The district apparently contends the commission was *required* to terminate McMackin's employment once it found McMackin unfit to teach. We disagree. A commission on professional competence determines not only whether the factual charges alleged by the district occurred, but whether dismissal is warranted on the basis of the proven charges. (§ 44944, subd. (c)(1); *Fontana, supra,* 45 Cal.3d at pp. 218-220.) As our Supreme Court has noted, "the Legislature intended more of a commission on professional competence than a simple determination whether cause exists for disciplinary action, resulting inexorably in the imposition of the sanction previously selected by the employing school district." (*Id.* at p. 221.) Rather, even if cause for dismissal exists, "a commission on professional competence is empowered to exercise its collective wisdom and discretion to determine that dismissal is not appropriate in a given case." (*Id.* at p. 222.) In other words, section 44932 provides that a teacher cannot be dismissed unless certain grounds are found to exist, but "does not provide that a teacher *must* be dismissed if one of those grounds is found." (*Id.* at p. 218.)

The commission plays a particularly important role in the selection of an appropriate penalty because " '[a] disciplinary discharge often involves complex facts and may require a sensitive evaluation of the nature and seriousness of the misconduct and whether it warrants the grave sanction of dismissal.' [Citation.]" (*California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 343-344.) Neither a trial court nor an appellate court can reverse an agency's determination of the appropriate disciplinary action unless there has been a manifest abuse of discretion. (*Ibid.*) Ordinarily, the superior court and the appellate court may not substitute their discretion for that of the commission. (*Ibid.*) " 'If reasonable minds may differ as to the propriety of the discipline imposed, the administrative decision may not be regarded as an abuse of discretion. [Citation.]' " (*Ibid.*)

Here, the commission acknowledged McMackin's conduct was "serious" and her judgment was "poor and misguided," but nonetheless viewed the October 4, 2012 incident as an isolated one which was not likely to recur. The commission noted McMackin had previously performed her job in a competent manner and praised McMackin's efforts to improve the educational experience for students at the center—students who by all accounts present more than their fair share of challenges to their teachers and administrators. The commission also found McMackin's testimony that she learned from the experience and would not repeat her mistake to be credible. In addition, the commission emphasized McMackin came forward shortly after the incident, admitted her mistake, and then fully cooperated with the district's investigation. We find no error in the trial court's conclusion that the weight of the evidence supports these findings by the commission.

From these undisputed facts, the commission inferred it was highly unlikely McMackin would engage in any similar misconduct in the future and therefore found dismissal too severe a penalty in this case. The court concluded the commission did not abuse its discretion, emphasizing McMackin's unblemished record and difficult assignment. While we are not unsympathetic to the challenges facing teachers in our public schools, we also believe the facts of this case are troubling. By permitting a drug sale on campus between two students—and encouraging the purchaser to mark the money and act as a "snitch"—McMackin placed both students in some danger at the time. At a minimum, McMackin's actions were wholly inconsistent with her role *in loco parentis*. While it may be true that McMackin performed her job competently in the past, it would not be unreasonable to conclude she is no longer able to do so given her conduct regarding the marijuana sale.

Nevertheless, as already noted, we are not permitted to substitute our judgment for that of the trial court or the commission, both of which concluded termination was too harsh a penalty for McMackin's substantial but isolated lapse in judgment. While we do not condone McMackin's actions, we hold, under the applicable standard of

15

appellate review, the trial court did not err in denying the district's petition for writ of mandate.

## DISPOSITION

The judgment is affirmed.  The real party in interest and respondent, Pamela McMackin, shall recover her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

HOGUE, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.